**2014-1048, -1061, -1062, -1063**

# United States Court of Appeals
# for the Federal Circuit

INTERNET PATENTS CORPORATION, f/k/a Insweb Corporation,

*Plaintiff – Appellant,*

*v.*

ACTIVE NETWORK, INC.,
THE GENERAL AUTOMOBILE INSURANCE SERVICES, INC.,
d/b/a The General, Permanent General Assurance Corporation,
PERMANENT GENERAL ASSURANCE CORPORATION OF OHIO,
QUINSTREET, INC., and TREE.COM, INC.,

*Defendants – Appellees.*

*Appeals from the United States District Court for the Northern District of California in Nos. 3:12-cv-05035-JSW, 3:12-cv-05036-JSW, 3:12-cv-06505-JSW, and 3:12-cv-06506-JSW, Judge Jeffrey S. White.*

## BRIEF FOR PLAINTIFF-APPELLANT
## INTERNET PATENTS CORPORATION, f/ka/ INSWEB CORPORATION

JOSEPH A. GRECO
JUSTIN T. BECK
KIMBERLY P. ZAPATA
BECK, BISMONTE & FINLEY, LLP.
150 Almaden Blvd., 10th Floor
San Jose, CA 95113
(408) 938-7900
*Attorneys for Appellant*
*Internet Patents Corporation,*
*f/k/a Insweb Corporation*

January 27, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Internet Patents Corporation v. Permanent General Assurance
Nos. 2014-1048, -1061, -1062, -1063

## CERTIFICATE OF INTEREST

Counsel for the Appellant, Internet Patents Coporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

      Internet Patents Corporation, FKA Insweb Corporation

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Not applicable

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Joseph A. Greco, Justin T. Beck, Kimberly P. Zapata of Beck, Bismonte &
      Finley LLP, (formerly known as Beck, Ross, Bismonte & Finley LLP);
      Michael P. Adams, Brian L. King of Winstead PC;
      and L. Eric Loewe.

Dated: January 27, 2014        /s/ Joseph A. Greco
                               Joseph A. Greco
                               Counsel for Appellant

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST .................................................................. i

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT .........................................................1

I.     Statement of the Issues ..............................................................1

II.    Statement of the Case and the Facts ........................................3

       A. Overview ...............................................................................3

       B. The Technology and the Patent-in-Suit ................................5

       C. The District Court Proceedings and Rulings .......................12

III.  Summary of Argument ..............................................................15

IV. Argument ....................................................................................18

       A. A De Novo Standard of Review Applies to All Issues Raised in this
          Appeal ..................................................................................18

       B. The District Court Erred by Failing to Properly Analyze the '505
          Patent and the Relevant Case Law ....................................19

          1. The District Court Failed to Analyze the Claim Language and
             Improperly Excluded the Meaningful, Concrete Limitations of the
             Claims .............................................................................19

          2. Even the District Court's Stripped Down, Generalized
             Characterization of "the Invention" Is Not an "Abstract Idea" ................25

ii

3. The District Court Misapplied the Supreme Court's Holding in
*Mayo* ..................................................................................................27

4. The District Court's Finding that "the Patent" Did Not Meet the
"Machine or Transformation" Test Is Wrong..............................29

C. The Judgments Cannot Be Upheld on Alternative Grounds Because
The General Did Not Show by Clear and Convincing Evidence That
the Claims Are Invalid as a Matter of Law ....................................32

1. A Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Must Be Denied
Unless the Only Plausible Reading of the Patent and the Facts
Establishes Clear and Convincing Evidence of Subject Matter
Ineligibility....................................................................................32

2. The General's Patent-Ineligibility Arguments are Based on a
Legally Incorrect Premise That the Claims' Concrete, Palpable, and
Tangible Limitations Can Be Ignored as "Conventional Steps"...............34

3. The General's Improper "Conventional Steps" Analysis Is
Contradicted by the '505 Patent's Specification and by the
Presumption of Validity.............................................................38

4. The General's "Conventional Steps" Argument Depends on Factual
Assumptions and Inferences That Are Not True as a Matter of Law........45

D. The Judgments May Be Reversed as to Claims 9 Through 16 on the
Grounds That They Include Computer System Hardware and Software
Components ................................................................................49

E. The Four Judgments Should Be Reversed and the Cases Remanded to
the District Court .......................................................................50

V.  Conclusion ....................................................................................50

ADDENDUM

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Accenture Global Services, GmBH v. Guidewire Software, Inc.,*
  728 F.3d 1336 (Fed. Cir. 2013) ............................................................. 13, 27, 50

*Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2012) .............................................................31

*Bilski v. Kappos,*
  561 U.S___, 130 S.Ct. 3218 (2010).............................................................. 5, 26

*CLS Bank Int.'l v. Alice Corp.,*
  717 F.3d 1341 (Fed. Cir. 2012) (*en banc*), *cert. granted, Alice Corp.*
  *v. CLS Bank Intl.*, 2013 U.S. Lexis 8777 (U.S., December 6, 2013) ........... passim

*Diamond v. Diehr,*
  450 U.S. 175 (1981)................................................................... passim

*Fort Properties Inc. v. American Master Lease LLC*,
  671 F.3d 1317 (Fed. Cir. 2012) .............................................................30

*In re Bergy,*
  596 F.2d 952 (C.C.P.A. 1979) .............................................................25

*In re Bilski,*
  545 F.3d 943 (Fed. Cir. 2008*)* .............................................................30

*In re Ferguson,*
  558 F.3d 1359 (Fed. Cir. 2009) .............................................................18

*Juniper Networks, Inc. v. Shipley*,
  643 F.3d 1346 (Fed. Cir. 2011) .............................................................18

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
  566 U.S. ___, 132 S. Ct. 1289 (2012) ......................................... passim

*Northern Telecom, Inc. v. Datapoint Corp.*,
908 F.2d 931 (Fed. Cir. 1990) ...................................................43

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ..................................................33

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................40

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) ..................................................32

*Ultramercial, Inc. v. Hulu, LLC*,
722 F.3d 1335 (Fed. Cir. 2013) ..................................... passim

## STATUTES

28 U.S.C. § 1295(a)(1) ...............................................................1

28 U.S.C. § 2107 ........................................................................1

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1338 ........................................................................1

35 U.S.C. § 101 ..........................................................................1

35 U.S.C. § 282 ........................................................................38

## OTHER AUTHORITIES

Fed. R. App. P. 4(a) ...................................................................1

Fed. R. Civ. P. 12(b)(6) ......................................................17, 33

# STATEMENT OF RELATED CASES

This Court's Order of December 27, 2013 (Rader, C.J.), consolidated the four appeals listed in the caption: *Internet Patents Corporation v. The General Automobile Insurance Services, Inc., d/b/a The General, Permanent General Assurance Corporation, Permanent General Assurance Corporation Of Ohio*, Case No. 14-1048; *Internet Patents Corporation v. Active Network, Inc.,* Case No. 14-1061; *Internet Patents Corporation v. QuinStreet, Inc.,* Case No. 14-1062; and *Internet Patents Corporation v. Tree.com, Inc.,* Case No. 14-1063.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). IPC timely filed its appeals from the district court's final decisions in the four district court cases under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a). This Court has exclusive jurisdiction under 28 U.S.C. § 1295(a)(1).

## I.    Statement of the Issues

A.    Did the district court err as a matter of law in granting The General's[1] Fed. R. Civ. P. Rule 12(b)(6) motion to dismiss the complaint on the grounds that

---

[1] "The General" will refer collectively to Defendants-Appellees The General Automobile Insurance Services, Inc., d/b/a The General, Permanent General Assurance Corporation, and Permanent General Assurance Corporation of Ohio.

the patent-in-suit is invalid because it lacks patent-eligible subject matter (35 U.S.C. § 101) when:

(1)     the claims are not directed to an abstract idea or ideas but rather contain concrete, palpable, and tangible limitations that refer to material objects and specific examples for improving the performance of a computer system when filling out on-line forms;

(2)     the district court's order of dismissal did not analyze the language of the claims, but instead relied on the patent's Abstract and specification to improperly simplify and generalize the invention as an "abstract idea"; and

(3)     while the claims are directed to patent-eligible subject matter, there are at least genuine issues of material fact that would have to be decided before any determination could be made that the claims are invalid for lacking patent-eligible subject matter?

B.     Did the district court err as a matter of law by dismissing IPC's actions against The Active Network, Inc. ("Active Network"), QuinStreet, Inc. ("QuinStreet"), and Tree.com, Inc. ("Tree.com") on the same grounds of lack of patent-eligible subject matter, based on the district court's decision in The General case?

## II.     Statement of the Case and the Facts

### A.     Overview

This case involves a district court's fundamental failure to follow controlling United States Supreme Court and Federal Circuit precedent on how an ineligible subject matter defense under 35 U.S.C. § 101 must be analyzed and decided.  The district court's Order Granting Defendants' Motion to Dismiss (A1-8) simply ignored the claims of U.S. Patent No. 7,707, 505 ("the '505 patent") (A52-83) in finding that "the patent" was directed to nothing but an "abstract idea."  The district court did not even discuss the language of the claims, let alone construe the claims.   Instead, the district court made reference only to the '505 patent's Abstract and a brief passage from the specification.

The district court failed to see that the '505 patent specifically claims methods and systems for improving the performance of computer hardware and software when used to create and fill out on-line forms, such as insurance applications.  That is, the '505 patent claims an improved machine – a computer system programmed for a specific function – and methods for using that improved machine to manipulate a material object, an on-line form.  The improvements involve the concrete and tangible step of maintaining the state of dynamic web pages that have information entered by the user.  This allows a user to fill out on-

3

line forms without losing data, even when the user employs a browser's "Back" and "Forward" navigation functionalities.

For purposes of illustration, a prior art system may have allowed a user to access an on-line insurance form, and may have "cached" the pages of that form that the user viewed. But prior art systems did not sufficiently maintain the state of the information that the user entered into the form, such as name, age, and place of residence. If the user left that page by clicking on a link to another page, all that may remain in cache was the bare bones form, not the information the user had entered. Therefore, if the user employed the browser's back and forth navigation functions to try to go back and change information on the page he or she had left, the information was lost, thereby failing to achieve the essential purpose of presenting the online form to the user.

By maintaining the state of the user-entered application information and other information such as "data dependencies" – *e.g.,* if California were entered on one page as the place of residence, that would determine available policies and rates that could be selected on subsequently visited pages – the '505 patent solved the data loss problem of prior art systems.

The '505 patent claims are not, therefore, directed to algorithms or formulas or "abstract ideas" – such as hedging risk for investments[2] or setting up escrow accounts[3] – that simply are performed on a standard computer system. Rather, the claims are directed to improving the function of a computer system to create and manipulate an improved on-line form. The claims include concrete, palpable, and tangible limitations that describe how the computer system and on-line form is improved.

The district court erred by granting The General's Rule 12(b)(6) motion to dismiss under § 101, then compounded the error by dismissing the three other cases, Active Network, QuinStreet, and Tree.com, on the same grounds (those Defendants-Appellees had not made any motion under § 101). All four judgments should be reversed.

### B.    The Technology and the Patent-in-Suit

IPC formerly was known as Insweb Corporation ("Insweb"). IPC is the same corporation, located in Northern California, as Insweb. The corporate name was changed in 2011. In 1999, IPC (Insweb) began operating an on-line insurance marketplace that enabled consumers to shop on-line for a variety of insurance

---

[2] *Bilski v. Kappos*, 561 U.S.___, 130 S.Ct. 3218 (2010).

[3] *CLS Bank Int.'l v. Alice Corp.*, 717 F.3d 1269 (Fed. Cir. 2013)(*en banc*), *cert. granted*, *Alice Corp. v. CLS Bank Intl.*, 2013 U.S. Lexis 8777 (U.S., December 6, 2013).

products, including automobile, term life, homeowners, renters and individual

health insurance, and to obtain insurance company-sponsored quotes for actual

coverage. A1003. In operating that business, IPC developed several e-commerce

technologies including "Dynamic Tabs," which provides website users with an on-

line application consisting of a series of dynamically generated web pages. A1003.

The on-line application is organized and presented to provide various features,

including easy navigation from page to page without data loss when using the

website tabs and conventional browser functionality. A1003-04.

The Dynamic Tabs technology that IPC developed for use in its business is

the basis for the '505 patent, which is entitled "Dynamic Tabs for a Graphical User

Interface." The patent was issued on April 27, 2010, based on an application that

was filed on March 23, 2000. The '505 patent describes the "Field of the

Invention" as:

> The present invention relates generally to computers and, more
> particularly, to computer-implemented systems for interfacing with
> application forms over on [sic] Internet or intranet.

A75, col. 1:15-18. The "dynamic tabs" of the '505 patent represent dynamically

generated web pages – also referred to as a "form set" – which manifest

themselves on the computer monitor screen as tabbed "panes" of data. The patent

explains:

> [T]he intelligent user interface is implemented as part of a series of dynamically generated web pages (a form set) presented to a user to an ecommerce Internet web site. This presentation is in the form of a collection of tabbed panes of data, the top-most selected pane being displayed on a web page, wherein each pane contains one or more pages of data and queries. This organization and presentation of the virtual application provides a means for re-entrant editing; error trapping, flagging, and correction; and easy navigation from sub-pane to sub-pane (page to page) within each pane and from pane to pane using the tabs and conventional browser Back and Forward button functionality.

A75, col. 2:66-3:10.

The patent uses filling out on-line insurance applications as an example, and identifies a frustrating problem that existed in prior art on-line systems:

> The process used in the prior art to fill out the application is essentially linear, and this has caused some confusion among applicants and users of the system who want to make changes in information already entered. Specifically, those wishing to comparison shop for insurance covering a variety of situations (for example, different drivers or cars on an automobile policy or different residence locations on a homeowners policy) have been frustrated by having to re-enter all or part of the information required in the application.

A75, col. 2:27-36. The patent goes on to identify the source of the problem in a more general sense:

> [T]he common convenience of the "Back" and "Forward" buttons (provided in all well-known Internet browsers) generally does not function properly when filling in on-line forms. Information is often lost when attempting to use the Back and Forward buttons to navigate within a multi-page virtual (on-line) form, particularly when using so-called "secure" forms such as those commonly employed in on-line ecommerce transactions.

A75, col. 2:37-44.  Subsequently, the patent identifies prior art on-line applications that suffer from the frustrating problem of data loss:

> Several on-line applications are currently available, including those of InsWeb Corp., QuickenInsurance[sm], eCoverage, esurance, Quicken.com, E-LOAN, and Amazon.com. While several offer graphical elements that look like tabs for triggering hyperlinks to other pages, questions, or data presentation relative to an on-line application for a service, all lack the enhanced user navigation capability provided by the present invention. In particular, while some application data state is preserved from page to page, the prior art lacks the ability to support arbitrary re-entry of application panes and sub-panes, dynamic pane and sub-pane customization dependent on user input, and real-time error flagging and guided user correction.

A77, col. 6:63-7:7.

As will be discussed below, the district court ruled that the '505 patent did not disclose or recite any example of the solution to the prior art problem that the patent identifies.  But the district court plainly was wrong.  The patent specifically describes how it improves on prior art computer systems and methods by maintaining the state of the tabbed panes (or "form sets"):

> The most important aspect of the user interface of the present invention is not that it *has* tabs or that it enables a certain amount of non-sequential (non-linear) access to the various form sets within a virtual application, but *that it maintains data state across all panes.*

A79, col. 9:45-49 (emphasis added).  As explained above, maintaining data state across all panes means preserving the information entered by the user into the on-

line application.  The patent goes on to explain that this is *not* what happened in

prior art systems:

> As well known by those of ordinary skill, *the Internet and web pages in particular are essentially stateless: no memory (or at most very little, such as the last page or pages visited) is preserved upon hyperlinking from one page to another.*  Prior art on-line forms have cached limited information either on the client or host server machines so that a form spanning several pages may be completed. *Such caching has been limited to discrete, user-supplied information rather than including virtual application status and data dependencies as is provided by the present invention.*

A79, col. 9:49-59 (emphasis added).  The patent gives an explanation of why the

prior art's limited "caching" is inadequate:

> Consider the following example; a virtual application consists of five logical form sets presented in tabbed panes labeled (in logical order of completion) A, B, C, D, and E. Assume that the user has completed tabs A, B, C, and D and is viewing tab E. Assume further that the user now realizes a piece of information in tab B must be changed. According to one embodiment of the present invention, she can click on tab B, change the information, and use the conventional browser Back button to return to tab E. Alternatively, the user can simply select tab E directly while viewing tab B and return to where she left off in tab E without any loss of data or the need to re-enter information.
>
> *While this sounds intuitive, it is in fact impossible under the prior art because the data entered in tabs C, D, and E (if any) will have been expired (i.e., erased and thus lost) by the act of switching to the tab B environment.* Data may be lost due to insufficient page cache resources on the server or client computers or due to security restrictions set by either the user or a system administrator. As an example of the latter situation, the well-known Internet Explorer browser version 5.0 for the Macintosh automatically erases (i.e., deliberately does not cache) secure web pages so that the Back button

always returns a blank (unfilled) form, rather than the previously filled-in one.

A79, col. 10:4-27 (emphasis added). The patent thus describes what it means by "state maintenance" or "maintaining state" and how that solves the problem in the prior art described above:

> *In contrast to the prior art, the present system, in all its embodiments, maintains virtual application information, relative dependencies, and information context obtained and/or derived from each pane accessed by the user/applicant. This state maintenance enables use of standard browser Back and Forward button functions without loss of data and without losing the user's "place" in the application process.* A user can therefore "back up" one or more sub-panes or panes (i.e., switch to a logically "earlier" tab) and correct or change a data entry without having to re-enter any data from that earlier point forward to the point at which the user jumped back.

A79, col. 9:60-10:3 (emphasis added).

The district court not only ostensibly ignored the portions of the specification quoted above, but also ignored the language of the claims, which describes the specific solution to the data loss problem. For example claim 1 states:

> 1.     A method of providing an intelligent user interface to an on-line application comprising the steps of:
>
> furnishing a plurality of icons on a web page displayed to a user of a web browser, wherein *each of said icons is a hyperlink to a dynamically generated on-line application form set,* and wherein said web browser comprises Back and Forward navigation functionalities;

> displaying said dynamically generated on-line application form set in response to the activation of said hyperlink, wherein said *dynamically generated on-line application form set comprises a state determined by at least one user input*; and
>
> *maintaining said state upon the activation of another of said icons, wherein said maintaining allows use of said Back and Forward navigation functionalities without loss of said state.*

A82, col. 15:52-67 (emphasis added). The other independent claims are "computer system" claim 9 and "computer-readable storage medium" claim 17. *See* A82, col. 16:39-55; A83, col. 17:16-31. They contain similar limitations to those recited above in claim 1.

Because claims 1, 9, and 16 are directed to patent-eligible subject matter, all the dependent claims also are directed to patent-eligible subject matter. But dependent claims add additional patent-eligible subject matter. For example, claim 2 states:

> 2. The method of claim 1, wherein said displaying said dynamically generated on-line application form set comprises combining information from a template file and either a database or a conditional merge file or both to form said dynamically generated on-line application form set.

A82, col. 16:13-17. *See also* similar limitations in claim 10 (dependent on claim 9) and claim 18 (dependent on claim 17). A82, col.16:56-60; A83, col. 18:1-6.

And claim 7 states:

> 7. The method of claim 1, wherein said web page comprises quasi-static elements distinct from said dynamically generated on-line

11

application form set, wherein said displaying said dynamically
generated on-line application form set in response to the activation of
said hyperlink affects the display of said quasi-static elements.

A82, col. 16:30-35. *See also* similar limitations in claim 15 (dependent on claim 9)

and claim 23 (dependent on claim 17). A83, cols.17:7-12, 18:21-27.

## C.    The District Court Proceedings and Rulings

IPC filed four patent infringement lawsuits in the Northern District of

California on the '505 patent against four different defendants: (1) Active

Network; (2) The General; (3) QuinStreet; and (4) Tree.com.

The cases initially were assigned to different judges. In April 2013, IPC

made a motion to Judge Jeffrey White, the judge with the earliest filed case (Active

Network) to relate all four cases under the Local Rules, so that all the cases would

be before Judge White. Judge White granted the motion on April 10, 2013.

A2075.

Prior to relation of the cases before Judge White, The General had filed a

Fed. R. Civ. P. 12(b)(6) motion to dismiss IPC's complaint on the grounds that the

'505 patent was invalid under 35 U.S.C. § 101, arguing that the patent was directed

to mere "abstract ideas" and claimed ineligible subject matter. A1042, A1046-48.

The General and IPC completed briefing on that motion in March 2013. A28 (Dkt.

34). When Judge White took over the case in April 2013, The General re-noticed

the motion on Judge White's calendar. A1119-21. After certain continuances not

relevant here, the motion was scheduled for hearing to take place on October 4, 2013.  A30 (Dkt. 47).

The other Defendants-Appellees did not file any motions related to 35 U.S.C. § 101; nor did they attempt to "join" in The General's motion.  On Friday, September 20, 2013, two weeks before the scheduled hearing of The General's motion, IPC submitted without argument (as required by the Local Rules) citations to three Federal Circuit opinions that had been issued after briefing of The General's motion to dismiss had been completed in March 2013:  *CLS Bank Int.'l v. Alice Corp.*, 717 F.3d 1269 (Fed. Cir. 2013)(*en banc*); *Ultramercial, Inc. v. Hulu, LLC,* 722 F.3d 1335 (Fed. Cir. 2013); and *Accenture Global Services, GmBH v. Guidewire Software, Inc.,* 728 F.3d 1336 (Fed. Cir. 2013).  A1133-35.

Four days later, on Tuesday, September 24, 2013, Judge White cancelled the oral argument, granted The General's motion, and dismissed IPC's complaint on the grounds that the '505 patent was invalid under 35 U.S.C. § 101 because, the district court ruled, it was directed to a patent-ineligible "abstract idea."  A1-8. The order did not discuss the '505 patent's claim language, relying instead on citations to the Abstract and specification.  Nor did the order discuss any of the three Federal Circuit cases IPC had brought to the district court's attention, except to reject IPC's argument, made in March 2013, that no decision on the motion should be made until *CLS Bank* was decided *en banc*.  A5 n.1.  Thus, despite IPC's

13

disclosure of the *CLS Bank en banc* opinion, the district court seemed to be unaware on September 24, 2013, that *CLS Bank* had been decided on May 10, 2013. The district court entered a final judgment on the same day, September 24, 2013. A9-10.

Also on September 24, 2013, the district court issued an identical Order to Show Cause in each of the three other cases in which defendants had not made a motion to dismiss based on § 101. The district court ordered IPC to show cause why, in light of the dismissal of The General case on the grounds that the '505 patent was invalid under § 101, the other cases should not also be dismissed. A2076-77; A3101-02; A4233-34.

On October 4, 2013, IPC filed an identical response to the Order to Show Cause in each of the three cases – Active Network, QuinStreet, and Tree.com – pointing out, among other things, that the district court in its decision in The General case had failed to consider the language of the claims and the *CLS Bank* and *Ultramercial* opinions. A2078-85; A3103-10; A4235-42. On October 11, 2013, Active Network, QuinStreet and Tree.com each filed an identical reply to IPC's response in all three cases. A2086-92; A3111-16; A4243-48.

On October 23, 2013, IPC filed its notice of appeal in The General case. A1238-40.[4] On October 25, 2013, the district court issued an identical order in all three of the other cases, dismissing them on the grounds that the patent was invalid under § 101, as the court had found in The General case, and stating that IPC's response to the Order to Show Cause was "unpersuasive." A11-12; A15-16; A19-20. The district court entered final judgments in all three cases on that same day, October 25, 2013. A13-14; A17-18; A21-22. IPC filed notices of appeal in all three of those cases on October 31, 2013. A2093-95; A3118-20; A4250-52.

On November 21, 2013, IPC filed with this Court IPC's Motion for Consolidation, Consolidated Briefing, and Consolidated Appendix. The Court granted the motion in part on December 27, 2013, but gave Defendants-Appellees the option of filing joint or separate opposition briefs.

## III.   Summary of Argument

All the claims of the '505 patent are directed to patent-eligible subject matter. The claims are not "abstract ideas" and are not even based on the

---

[4] IPC filed its notice of appeal on October 23, 2013, stating in the document that the appeal was to the Federal Circuit. A1239. The only available Northern District of California ECF appeal form caused the ECF system to reflect that the appeal was to the Ninth Circuit. After conferring with the court clerk, IPC created a customized ECF form and re-filed the same notice of appeal the next day, October 24, so that the ECF system would note that the appeal was to the Federal Circuit. A1242-44. Even if the notice of appeal had first been filed on October 24, 2013, the appeal would be timely.

application of any "abstract idea." Rather, they contain concrete, palpable, and tangible limitations that describe an improved computer system that can more efficiently be used to create and fill out on-line forms. The claimed methods and systems describe how to avoid the frustrating loss of data suffered by prior art systems when users employed the "Back" and "Forward" navigation functionalities of web browsers. The claims describe particular machines that have been configured in a way so that the state of dynamic web pages (called "form sets") is based on at least one user input and is preserved when a user clicks on a new icon representing a different web page.

This Court reviews the district court's orders and judgments in this case de novo. The district court erred by granting The General's Rule 12(b)(6) motion to dismiss for failure to state a claim, based on the district court's finding that the '505 patent was invalid under 35 U.S.C. § 101 for not "disclosing" anything but an "abstract idea." The district court's analysis was so flawed that, not only did it fail to construe the claims, it did not even discuss any claim language. Instead, the district court referenced only the '505 patent's Abstract and a brief portion of the specification, while ignoring the meaningful, concrete limitations in the claims themselves. The district court subsequently adopted its invalidity finding in The General case and dismissed IPC's cases against Active Network, QuinStreet, and Tree.com, thus committing the same error.

The judgments cannot be affirmed on grounds alternative to those set forth in the district court's order granting The General's Rule 12(b)(6) motion.  The General's arguments that the claims are directed to one or more "abstract ideas" are wrong for multiple reasons.  First, The General employed a flawed "conventional steps" argument, whereby it read out of the claims any limitation – no matter how specific or concrete – that The General contended existed in the prior art.  Second, The General's "conventional steps" argument not only is legally wrong, but is contradicted by the '505 patent specification itself, which specifically describes how the claimed invention improves on prior art systems, as is The General's argument that the claims fail to meet the "machine-or-transformation" test.  Third, at most, The General's "conventional steps" and "machine-or-transformation" test arguments are based on factual assumptions and inferences that are not true as a matter of law and thus cannot be resolved on a Rule 12(b)(6) motion.

This Court should reverse the judgments in all four cases on the grounds that the claims of the '505 patent are directed to patent-eligible subject matter under 35 U.S.C. § 101, and remand the cases to the district court.  In the alternative, the Court should reverse the judgments in all four cases on the grounds that there are at least genuine issues of fact as to whether the claims of the '505 patent are directed to patent-eligible subject matter, and remand the cases to the district court.

## IV.  Argument

### A.  A De Novo Standard of Review Applies to All Issues Raised in this Appeal

All issues raised in this appeal concern whether the district court properly granted The General's motion to dismiss IPC's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), based on the district court's ultimate determination that the '505 patent is invalid for lack of patent-eligible subject matter under 35 U.S.C. § 101.  The district court dismissed IPC's complaints against Active Networks, QuinStreet, and Tree.com on the same grounds.  This Court has held that:

> This court reviews a district court's dismissal for failure to state a claim under the law of the regional circuit.  *Juniper Networks, Inc. v. Shipley,* 643 F.3d 1346, 1350 (Fed. Cir. 2011) (citation omitted).  The Ninth Circuit reviews de novo challenges to a dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 403 F.3d 1050, 1055 (9th Cir. 2005).  This court also reviews the ultimate determination regarding patent-eligible subject matter under 35 U.S.C. § 101 without deference.  *In re Ferguson,* 558 F.3d 1359, 1363 (Fed. Cir. 2009).

*Ultramercial*, 722 F.3d at 1338.  Accordingly, the standard of review for all issues in this appeal is de novo.

**B.    The District Court Erred by Failing to Properly Analyze the '505 Patent and the Relevant Case Law**

**1.    The District Court Failed to Analyze the Claim Language and Improperly Excluded the Meaningful, Concrete Limitations of the Claims**

Any proper analysis of patent eligibility must be based on the language of

the claims.  In *Ultramercial,* this Court explained that:

> In determining on which side of the [patent-eligibility] line the claim falls, the court must focus on the claim as a whole. As the [Supreme] Court explained:
>
> > In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered *as a whole*. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis.

*Id.* at 1344 (quoting *Diamond v. Diehr*, 450 U.S. 175, 188, 101 S. Ct. 1048 (1981)

(emphasis added)).  *Ultramercial* goes on to state that:

> The Court has long-recognized that any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims.
>
> Instead, the relevant inquiry is whether a claim, as a whole, includes *meaningful* limitations restricting it to an application, rather than merely an abstract idea.

*Id.* at 1344 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 566 U.S.

___, 132 S. Ct. 1289, 1297 (2012) (emphasis in original)).  "[T]he question of

eligible subject matter must be determined on a claim-by-claim basis."

*Ultramercial,* 722 F.3d at 1340.

The district court violated this fundamental legal principle that is clearly

stated in the controlling Supreme Court and Federal Circuit authority. Instead, the

district court did exactly what controlling Supreme Court and Federal Circuit

precedents forbid: the district court hunted for abstractions by ignoring the

language of even the broadest claims (claims 1, 9 and 17). *See* A5. Indeed, rather

than determine what *is* claimed, the district court only mentioned what it believed

is *not* claimed:

> The '505 patent also discloses an intelligent user interface for "re-
> entrant editing; error-trapping, flagging, and correction" although
> these applications are not specifically claimed.

A5, lines 6-8.

The district court thus ruled that "the Patent" is "ineligible under § 101"

(A5, line 19) without referencing, analyzing or explaining why the following claim

language, which describes improved creation and manipulation of on-line forms by

the use of improved computer hardware and software, is not patent-eligible subject

matter[5]:

---

[5] As referenced above in Section II.B, independent claim 9 and dependent claims
10 and 15 are directed to "a computer system," and have limitations similar to
those of method claims 1, 2 and 7. Independent claim 17 and dependent claims 18
and 23 are directed to "a computer readable storage medium" and have limitations

## Claim 1

- furnishing a plurality of icons on a web page displayed to a user of a web browser, wherein each of said icons is a hyperlink to a dynamically generated on-line application form set, and wherein said web browser comprises Back and Forward navigation functionalities;

- displaying said dynamically generated on-line application form set in response to the activation of said hyperlink, wherein said dynamically generated on-line application form set comprises a state determined by at least one user input;

- maintaining said state upon the activation of another of said icons, wherein said maintaining allows use of said Back and Forward navigation functionalities without loss of said state.

## Claim 2 (dependent on claim 1)

- displaying said dynamically generated on-line application form set comprises combining information from a template file and either a database or a conditional merge file or both to form said dynamically generated on-line application form set.

## Claim 7 (dependent on claim 1)

- wherein said web page comprises quasi-static elements distinct from said dynamically generated on-line application form set, wherein said displaying said dynamically generated on-line application form set in response to the activation of said hyperlink affects the display of said quasi-static elements.

A82, cols. 15:52-16:17; A83, col. 16:29-34.

Rather than discuss any of the above *claim* language, the district court

improperly stripped down, simplified, generalized, and paraphrased what it

---

similar to those of method claims 1, 2 and 7, and computer system claims 9, 10, and 15.

characterized as "the Patent," referencing only the '505 patent's Abstract and a brief cite to the specification. A5. Indeed, the district court's analysis ("Application of Section 101 to '505 Patent") began with an incorrect premise, precisely because the court failed to analyze the language of the claims. Citing to "Patent at Abstract," the district court stated:

> The '505 Patent claims the exclusive right to allow the use of conventional web browser Back and Forward navigational functionalities without data loss in an online application consisting of dynamically generated web pages.

A5, lines 4-6. This overbroad statement, which the district court copied word-for-word from The General's motion (A1048, lines 23-25), is contradicted by the claims. For example, to infringe one of the broadest claims, method claim 1 of the '505 patent, a party would have to perform at least the following steps:

- furnishing a plurality of icons on a web page displayed to a user of a web browser, wherein each of said icons *is a hyperlink to a dynamically generated on-line application form set*; and

- displaying said dynamically generated on-line application form set in response to the activation of said hyperlink, wherein *said dynamically generated on-line application form set comprises a state determined by at least one user input*; and

- *maintaining said state* upon the activation of another of said icons.

A82, col. 15:52-67 (emphasis added). Thus, contrary to the district court's analysis, IPC does *not* "claim an exclusive right" to "the use of conventional web browser Back and Forward navigational functionalities without data loss in an

online application consisting of dynamically generated web pages." Rather, no one can infringe claim 1 of the '505 patent unless he or she uses a computer system that has the icons hyperlinked to a dynamically generated form set (*i.e.*, dynamically generated web pages); that has the form sets comprising a state in response to at least one user input; and that maintains that state when another icon hyperlinked to another dynamically generated form set is activated. Moreover, a person skilled in the art – indeed, even a lay person – will recognize these requirements as concrete, meaningful limitations, not mere "abstract ideas."

The claim language analyzed above also refutes the second part of the district court's analysis:

> On its face, the '505 Patent purports to propose a solution to a well-known problem regarding user navigation in online multi-page application forms. However, the Patent does not actually disclose or recite an example of the solution to this problem. The mere abstract idea that an invention could address the challenges of retaining information lost in the navigation of online forms fails to satisfy the requirements of patentability and renders the Patent is (sic) ineligible under § 101.

A5, lines 14-19. As shown above in this Section IV.B.1, contrary to the district court's unsupported conclusion, there are meaningful limitations in claim 1 (and in the other similar independent and dependent claims) that do, in fact, recite a specific example of how to keep a computer system from losing information when the user navigates to different parts of on-line forms using a browser's "Back" and

"Forward" functionalities; namely:  use icons hyperlinked to a dynamically generated form set; create the form sets so that they comprise a state in response to at least one user input; and create the system so that it maintains that state when another icon hyperlinked to another dynamically generated form set is activated. Moreover, the portions of the specification discussed in Section II.B, above, well illustrate that what the '505 patent means by "maintaining state" describes an improvement over prior art systems which allows the claimed invention to overcome the frustrating loss of information that users of those systems experienced when filling out on-line forms.

It is not clear *why* the district court decided to ignore these specific, concrete and meaningful claim limitations; the district court cancelled oral argument and thus IPC's counsel did not have an opportunity to address questions that the district court might have had about the patented technology and the relevant case law.  But the district court's concluding sentence in its "abstract idea" analysis, which cites *Mayo*, states that the '505 patent was invalid for "merely setting out the abstract idea of a known technological challenge without setting out any specific *disclosures* …." A5, lines 19-21 (emphasis added).  This analysis seems to be applying an enablement standard, *i.e.*, criticizing the sufficiency of the patent's "disclosures," rather than the language of the claims.  While IPC believes that the '505 patent's disclosures are, in fact, enabling, and they are presumed to be

enabling under 35 U.S.C. § 282, enablement is not an issue in this appeal. As this

Court stated in *Ultramercial*:

> [W]ritten description and enablement are conditions for patentability
> that Title 35 sets "wholly apart from whether the invention falls into a
> category of statutory subject matter." *Diehr,* 450 U.S. at 190 (quoting
> *In re Bergy,* 596 F.2d 952, 961 (C.C.P.A. 1979)). The "coarse
> eligibility filter" of § 101 is not the statutory tool to address concerns
> about vagueness, indefinite disclosure, or lack of enablement, as these
> infirmities are expressly addressed by § 112.

*Ultramercial,* 722 F.3d at 1354.

The district court's ruling that the '505 patent is directed to nothing but an

"abstract idea" is wrong and should be reversed.

### 2.  Even the District Court's Stripped Down, Generalized Characterization of "the Invention" Is Not an "Abstract Idea"

The district court's characterization of the subject matter of "the Patent" –

"retaining information lost in the navigation of online forms" – is not even itself an

"abstract idea." This Court has held that "[a]n abstract idea is one that has no

reference to material objects or specific examples--*i.e.*, it is not concrete."

*Ultramercial*, 722 F.3d at 1343. While the district court's generalized

characterization is certainly broader than the actual *claimed* inventions, it

nevertheless refers to material objects – on-line forms. On-line forms are, of

course, material objects that are created by programming computer hardware and

software so that the forms appear on a computer monitor and can be manipulated using the computer hardware and software.

Moreover, the remainder of the district court's characterization – retaining information lost in the navigation of those forms[6] – demonstrates that the '505 patent is directed toward *improving the functioning of the material objects*, *i.e.,* the on-line forms that are the product of computer hardware and software. The '505 patent does not merely implement on standard computer hardware and software an "abstract idea" such as the hedging of risk for investments involved in the *Bilski* case or the setting up of escrow accounts involved in the *CLS Bank* case. In contrast to the patent claims in those cases, the '505 patent claims are for improvements to the function of standard computer hardware and software that enhance the user's ability to manipulate on-line forms created by that hardware and software. Therefore, even apart from the district court's error in failing to determine patent-eligibility based on the claim language, the court's "abstract idea" conclusion is still wrong.

---

[6] While the district court's language does not literally make sense in terms of the '505 patent's teaching, presumably what the district court meant was "retaining information that would otherwise be lost in the navigation of online forms."

### 3. The District Court Misapplied the Supreme Court's Holding in *Mayo*

The district court clearly erred in holding that *Mayo* supported finding that the '505 patent is directed to ineligible subject matter. A5, lines 19-23. In particular, *Mayo* requires an analysis of the language of the *claims*. As this Court has stated:

> The plurality opinion in *CLS Bank* identified a two-step process, de-rived from the Supreme Court's decision in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* ___U.S___, 132 S. Ct. 1289, 182 L. Ed. 2d 321 (2012), for analyzing patent eligibility under § 101. First, the court must identify "whether the *claimed invention* fits within one of the four statutory classes set out in § 101." *CLS Bank*, 717 F.3d at 1282. Second, one must assess whether any of the judicially recognized exceptions to subject-matter eligibility apply, including whether *the claims* are to patent-ineligible abstract ideas. *Id.* (citing *Mayo, 132 S. Ct. at 1302-03*).

*Accenture*, 728 F.3d at 1341 (emphasis added). Indeed, the *Mayo* opinion is replete with references to claim 1 of the patent-in-suit there, which the Supreme Court found to be representative of the other claims. *Mayo*, 132 S. Ct. at 1295

The patent claims in *Mayo* did not involve an "abstract idea"; rather, they involved a "law of nature" – "namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm." *Id.* at 1296. The Supreme Court explained that the law of nature was described in the language of the claims:

Claim 1, for example, states that *if* the levels of 6–TG in the blood (of a patient who has taken a dose of a thiopurine drug) exceed about 400 pmol per $8 \times 10^8$ red blood cells, *then* the administered dose is likely to produce toxic side effects. While it takes a human action (the administration of a thiopurine drug) to trigger a manifestation of this relation in a particular person, the relation itself exists in principle apart from any human action. The relation is a consequence of the ways in which thiopurine compounds are metabolized by the body— entirely natural processes. And so a patent that simply describes that relation sets forth a natural law.

*Id.* at 1296-97 (emphasis in original). The Supreme Court went on to explain that:

The question before us is whether the claims do significantly more than simply describe these natural relations. To put the matter more precisely, do the patent claims add *enough* to their statements of the correlations to allow the processes they describe to qualify as patent-eligible processes that *apply* natural laws? We believe that the answer to this question is no.

*Id.* at 1297 (emphasis in original). Thus, *Mayo* began its analysis by identifying the portion of *the language of the claims* that did nothing more than describe a law of nature. Then *Mayo* focused specifically on the claim language to see if there were any meaningful limitations beyond the claim's recitation of the natural law.

The Supreme Court stated:

What else is there in the claims before us? The process that each claim recites tells doctors interested in the subject about the correlations that the researchers discovered. In doing so, it recites an "administering" step, a "determining" step, and a "wherein" step.

*Id.* After describing the three claim steps in more detail, the Supreme Court concluded that:

The upshot is that the three steps simply tell doctors to gather data from which they may draw an inference in light of the correlations. To put the matter more succinctly, the claims inform a relevant audience about certain laws of nature; any additional steps consist of well understood, routine, conventional activity already engaged in by the scientific community; and those steps, when viewed as a whole, add nothing significant beyond the sum of their parts taken separately. For these reasons we believe that the steps are not sufficient to transform unpatentable natural correlations into patentable applications of those regularities.

*Id.* at 1298.

The essence of *Mayo*'s holding was, therefore, that the patent claim clearly recited a law of nature, which by itself could not be patented, and added language that merely described a routine *use* of that law of nature. Unlike *Mayo*, however, the district court in this case did not focus on the claim language at all, but merely characterized "the Patent" as being directed to an abstract idea with no meaningful limitations on its use. By failing to analyze the language of any of the '505 claims, and by thus ignoring all the meaningful, concrete limitations discussed above, the district court did not properly follow *Mayo*, and erred as a matter of law in finding the '505 patent invalid.

### 4. The District Court's Finding that "the Patent" Did Not Meet the "Machine or Transformation" Test Is Wrong

The district court also erred in rejecting IPC's argument that the "machine-or-transformation test" weighed in favor of rejecting The General's motion to dismiss. As the *Ultramercial* court pointed out, although the "machine-or-

transformation" test is not determinative of whether or not patent claims are

directed to eligible subject matter, the test can be useful:

> This court at one point set forth a machine-or-transformation test as the exclusive metric for determining the subject matter eligibility of processes. *In re Bilski,* 545 F.3d 943, 956 (Fed. Cir. 2008*), aff'd on other grounds, Bilski,* 130 S. Ct. 3218, 177 L. Ed. 2d 792.  The Supreme Court rejected this approach in *Bilski*, noting that the machine-or-transformation test is simply "a useful and important clue, an investigative tool, for determining whether *some* claimed inventions are processes under § 101" and is not "the sole test for deciding whether an invention is a patent-eligible 'process.'" 130 S. Ct. at 3227 (emphasis added).

*Ultramercial*, 722 F.3d at 1343.

The district court, continuing to ignore the specific, concrete claim

limitations discussed above, stated that:

> Plaintiff contends that its claims are patent-eligible under the machine-or-transformation test based on the position that each claim and the desired result require computer implementation.  However, the "mere implementation on a computer of an otherwise ineligible abstract idea will not render the asserted 'invention' patent eligible."

A6, lines 3-7 (quoting *CLS Bank Int'l v. Alice Corp.*, 685 F.3d 1341, 1351 (Fed.

Cir. 2012) (citing *Fort Properties Inc. v. American Master Lease LLC*, 671 F.3d

1317, 1322 (Fed. Cir. 2012) ("[A]n abstract concept cannot be transformed into

patentable subject matter merely because of connections to the physical world.")).

The district court, however, misunderstood IPC's argument.  IPC was

careful to point out in its brief that it was *not* contending that mere implementation

on a computer of an otherwise ineligible abstract idea will render the asserted

invention patent eligible.  After summarizing cases where several "business

method" patents had been held invalid under § 101, IPC stated:

> In such cases, the claimed method of doing business did not become
> patent eligible merely because the method was computer aided or
> implemented in software.

A1097, lines 12-14.  Rather, IPC relied on the claim limitations such as those

discussed above, including "a series of dynamically generated web pages (e.g., a

form set)," to argue patentability.  A1098.  IPC explained that:

> This technology helps solve the problem of a user having to re-enter
> all or part of the information required by an online application if they
> want to go back and make some changes to information already
> entered.

 A1098, lines 17-19.  As such, IPC distinguished between the '505 claims, which

*improve* the structure and function of on-line forms and their manipulation by

improving the functioning of computer hardware and software, and patent claims

that merely *use* computers for "making calculations or computations" to implement

an otherwise patent-ineligible process.  A1099, lines 22-27 (citing *Bancorp

Services, L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278

(Fed. Cir. 2012) (claims for "administering and tracking the value of life insurance

policies" found patent-ineligible)).  In that regard, IPC compared the '505 claims

to the patent claims in *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d

859 (Fed. Cir. 2010):

> In *Research Corp.*, the court upheld the patentability of a claimed
> method for rendering a halftone image of a digital image "to produce
> visually pleasing dot profiles" even though the broadest independent
> claim did not claim a computer or computer implemented steps for
> arriving at that result. 627 F.3d at 865-68. In that case, the court
> found that because the method required the manipulation of computer
> data structures and the output of a modified computer data structure,
> the method could not, as a practical matter, be performed entirely in a
> human's mind. *Id.* at 868.

A1100, lines 6-13. Similar to the patent in *Research Corp.*, the '505 patent claims

are directed to improved structures and functions for the creation and use of on-line

forms, not merely to implementing a patent-ineligible abstract idea on standard

computer hardware and software. As such, all the claims of the '505 patent meet

the "machine-or-transformation" test. The district court's conclusion that "the

Patent" did not meet that test is wrong as a matter of law.

### C.     The Judgments Cannot Be Upheld on Alternative Grounds Because The General Did Not Show by Clear and Convincing Evidence That the Claims Are Invalid as a Matter of Law

#### 1.     A Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Must Be Denied Unless the Only Plausible Reading of the Patent and the Facts Establishes Clear and Convincing Evidence of Subject Matter Ineligibility

The General cannot prevail by asking this Court to look past the district

court's erroneous analysis and conclusions, and to affirm the judgment for other

reasons.  As IPC will show, The General's arguments also are legally erroneous.

Moreover, at most, they are based on factual issues that cannot be resolved by a

motion to dismiss under Fed. R. Civ. P. 12(b)(6).

Under the procedural law of the Ninth Circuit (the relevant regional circuit)

pertaining to Rule 12(b)(6) motions, "[a] complaint should not be dismissed unless

it appears beyond doubt that the plaintiff cannot prove any set of facts that would

entitle him or her to relief." *Nursing Home Pension Fund, Local 144 v. Oracle*

*Corp.*, 380 F.3d 1226, 1229 (9th Cir. 2004).  In *Ultramercial*, this Court stated

that:

> [I]t will be rare that a patent infringement suit can be dismissed at the
> pleading stage for lack of patentable subject matter. This is so because
> every issued patent is presumed to have been issued properly, absent
> clear and convincing evidence to the contrary.

*Ultramercial*, 722 F.3d at 1338.  Thus, the Court held that a Rule 12(b)(6) motion

should be denied unless "the *only* plausible reading of the patent must be that there

is clear and convincing evidence of ineligibility."  *Id.* at 1339 (emphasis in

original).  The Court explained that:

> [T]he analysis under § 101, while ultimately a legal determination, is
> rife with underlying factual issues. For example, while members of
> this court have used varying formulations for the precise test, there is
> no doubt the § 101 inquiry requires a search for limitations in the
> claims that narrow or tie the claims to specific applications of an
> otherwise abstract concept. …Likewise, any inquiry into the scope of
> preemption--how much of the field is "tied up" by the claim--by
> definition will involve historic facts: identifying the "field," the

> available alternatives, and preemptive impact of the claims in that field. The presence of factual issues coupled with the requirement for clear and convincing evidence normally will render dismissal under Rule 12(b)(6) improper.

*Id.*  As shown below, the judgments based on The General's Rule 12(b)(6) motion must be reversed when the above standards are applied.

> **2.  The General's Patent-Ineligibility Arguments are Based on a Legally Incorrect Premise That the Claims' Concrete, Palpable, and Tangible Limitations Can Be Ignored as "Conventional Steps"**

The General's underlying methodology was to (i) dissect claim 1 of the '505 patent by identifying what it contended were two "known" or "conventional" steps; (ii) characterize the third step as merely a "desired result"; and (iii) conclude that all the claims of the '505 patent were thus directed to mere "abstract ideas" and thus ineligible for patentability.  A1057-61.  Thus, with respect to the three steps of claim 1 discussed above in Section IV.B.1, The General argued that:

> IPC's claimed process includes three steps, the first two of which are directed to conventional steps, and the third of which is directed to a desired result without any meaningful limitations as to how the result is achieved.

A1057, lines 16-18.  IPC shows in Section IV.C.3, *infra*, why this factual analysis is contradicted by the '505 patent's specification.  Nevertheless, even if it were factually correct, it could not support a finding that the claims are directed to ineligible subject matter under § 101.

The General simply misconstrued the case law.  It contended that its

"conventional steps" analysis was proper because:

> A claim may appropriately be analyzed for § 101 eligibility by breaking it down into its relevant steps to identify any known exceptions, and then analyzing the claim as a whole to determine if the additional steps recite any more than "well-understood, routine, conventional activity" so as to describe a "patent-eligible application." *See Mayo*, 132 S. Ct. at 1297-98.

A1057, lines 11-15.  This argument misstates *Mayo* and is directly contrary to the

Supreme Court's *Diehr* case and this Court's *Ultramercial* case.  In *Diehr*, the

Supreme Court held that:

> In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered as a whole.  *It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis.*

*Diamond v. Diehr*, 450 U.S. 175, 188 (1981) (emphasis added).  The Supreme

Court added that:

> In order for the dissent to reach its conclusion it is necessary for it to read out of respondents' patent application all the steps in the claimed process which it determined were not novel or "inventive." That is not the purpose of the § 101 inquiry . . . .

*Id.* at 193 n.15.  *See also Ultramercial*, 722 F.3d at 1344 ("A court cannot go

hunting for abstractions by ignoring the concrete, palpable, tangible limitations of

the invention the patentee actually claims.").  The General simply violated these

rules, and apparently convinced the district court that its violation of the rules was sanctioned by *Mayo*.

But *Mayo* did not overrule *Diehr* and does not support The General's "conventional steps" methodology, whereby The General eliminates "known" steps or elements from the claim, and then concludes that all that is left is an "abstract idea." As mentioned in Section IV.B.3, above, *Mayo* began by identifying a law of nature recited in the claim language, *i.e.,* "relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm." *Mayo* then analyzed whether the remainder of the claim effectively described anything more than a routine use of the law of nature. The Supreme Court noted that, in addition to the law of nature, the claims described three steps: "an 'administering' step, a 'determining' step, and a 'wherein' step." *Mayo*, 132 S. Ct. at 1297. The Supreme Court found that "[t]he upshot is that the three steps simply tell doctors to gather data from which they may draw an inference in light of the correlations [of the natural law]." *Id.* at 1298. Clearly, it was the claims' lack of tangible, meaningful limitations beyond a mere routine use of the recited natural law that led the Supreme Court to find patent ineligibility, not the fact that the claims recited "known" or "conventional" steps.

The invention of the '505 patent, as described in the claims, is not a "law of nature" or an "abstract idea." As discussed above and in Section IV.C.3, *infra*, the invention consists of "concrete, palpable, tangible limitations" that describe an improved machine – a programmed computer that creates improved on-line forms – and the use of that machine to fill out those on-line forms without the frustration of losing data when a browser's back and forth navigation capabilities are employed. These concrete, meaningful limitations – including maintaining the state of dynamic web pages that have had information entered by a user – cannot be ignored or "disqualified" when analyzing patent eligible subject matter under § 101, even if they were all "known" or "conventional" prior to the filing of the '505 patent application. *Ultramercial*, 722 F.3d at 1344; *Diehr*, 450 U.S. at 188, 193 n. 15. *Mayo* does not in any way hold to the contrary.

Indeed, The General's claim-dissecting "conventional steps" methodology would collapse every § 101 inquiry into a § 102 anticipation or § 103 obviousness inquiry. That is, as long as an element could be found in the prior art and be characterized as "known" or "conventional," it would be eliminated and ignored when performing the § 101 inquiry. One could thus imagine the most tangible, physical patent claims – claims requiring elements such as concrete slabs and steel panels and nuts and bolts – being characterized as patent-ineligible "abstract ideas" because all those elements were "known" and "conventional." This, of course,

makes no sense. Every patent invalid under § 102 for anticipation – and most if not all patents invalid under § 103 for obviousness – would also necessarily be invalid under § 101.

The General's § 101 defense fails for the above reasons alone.

### 3. The General's Improper "Conventional Steps" Analysis Is Contradicted by the '505 Patent's Specification and by the Presumption of Validity

The General's "conventional steps" argument in the district court was based on the remarkable and false proposition that the specification of the '505 patent *admits* that it adds nothing of substance to the relevant art. A1057-60. Thus, The General concluded that:

> Taken as a whole, the three steps of claim 1 recite an entirely conventional process for generating an online application form, with the exception of a single functional recitation in the form of a "wherein" clause. None of the steps, individually or as a whole, describe how the function (i.e., desired result) is to be implemented or otherwise integrate the desired result into the claim as a whole.

A1059, lines 8-12. The General is wrong. As discussed below, The General's conclusion is based on selective and misleading quotes from the specification. But it also flies in the face of the statutory presumption of validity, 35 U.S.C. § 282. To believe The General's argument, one would have to believe that the Patent Office issued the patent after reading a specification that *admitted* that no invention

existed; *i.e.,* that the claims were either completely anticipated by the prior art or, at the very least, rendered obvious by the prior art.

More important, however, The General's argument flies in the face of the specification. As quoted above in Section II.B, the '505 patent makes quite clear that it improves computer hardware and software used for completing on-line forms:

> The most important aspect of the user interface of the present invention is not that it has tabs or that it enables a certain amount of non-sequential (non-linear) access to the various form sets within a virtual application, but *that it maintains data state across all panes.* As well known by those of ordinary skill, *the Internet and web pages in particular are essentially stateless: no memory (or at most very little, such as the last page or pages visited) is preserved upon hyperlinking from one page to another.* Prior art on-line forms have cached limited information either on the client or host server machines so that a form spanning several pages may be completed. *Such caching has been limited to discrete, user-supplied information rather than including virtual application status and data dependencies as is provided by the present invention.*

A79, col. 9:45-59 (emphasis added). The specification goes on to unequivocally explain that the invention it describes is *not* based on "an entirely conventional process for generating an online application form," as The General argued, but rather improves on that process:

> In contrast to the prior art, the present system, in all its embodiments, maintains virtual application information, relative dependencies, and information context obtained and/or derived from each pane accessed by the user/applicant. This state maintenance enables use of standard browser Back and Forward button functions

> *without loss of data and without losing the user's "place" in the application process.* A user can therefore "back up" one or more sub-panes or panes (i.e., switch to a logically "earlier" tab) and correct or change a data entry without having to re-enter any data from that earlier point forward to the point at which the user jumped back.

A79, col. 9:60-10:3 (emphasis added). Any proper reading of the '505 patent claims for purposes of a § 101 analysis must take into account this explanation of the claimed invention. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-17 (Fed. Cir. 2005)(*en banc*) (specification must be considered for proper construction of claims). The General's analysis not only failed to do so, but indeed twisted this statement of what *was* invented into an admission that *nothing* was invented.

The General argued that claim 1's step of "displaying said dynamically generated online application form set in response to the activation of said hyperlink, wherein said dynamically generated on-line application form set comprises a state determined by at least one user input," was, by the '505 patent's own admission, "conventional." A1058, lines 9-14. The General argued this was so because the specification admits that prior art "automated insurance quoting systems" could collect different types of information, including information supplied by a user, and "[b]ased on the information provided, insurance quotes could subsequently be generated in an automated fashion." A1058, lines 13-20. The General concluded that:

> Therefore, a data state of a web page for collecting information would
> be determined by at least one user input relating to, e.g., the type of
> insurance quote or coverage requested, and a data state of a web page
> for providing a quote would be determined by at least one user input
> relating to criteria or parameters for generating the requested quote.

A1058, lines 20-24. This is a distortion of the specification. The '505 patent

explains that the invention claimed is "in contrast" to the prior art's limited caching

because the '505 patent maintains the state of the dynamic web pages by

"maintain[ing] virtual application information, relative dependencies, and

information context obtained and/or derived from each pane accessed by the

user/applicant." A79, col. 9:61-63. The patent explains that "*[t]his* state

maintenance enables use of standard browser Back and Forward button functions

without loss of data and without losing the user's 'place' in the application

process." A79, col. 9:64-66 (emphasis added). The patent explains that the limited

caching of the prior art is *not* the claimed "state maintenance":

> Prior art on-line forms have *cached limited information* either on the
> client or host server machines so that a form spanning several pages
> may be completed. Such caching has been limited to discrete, user-
> supplied information *rather than including virtual application status
> and data dependencies as is provided by the present invention*.

A79, col. 9:53-59 (emphasis added). The General's attempt to rewrite the

specification to suit its legally baseless "conventional steps" argument is thus also

factually wrong based on the language of the specification.

The General went on to argue that claim 1's step of "maintaining said state upon the activation of another of said icons, wherein said maintaining allows use of said Back and Forward navigation functionalities without loss of said state" is merely a "conventional" step containing a "wherein clause" with a "single functional recitation." A1058-59. Again, this argument is contradicted by the patent specification. The mere fact that prior art on-line applications could save some data did not allow them to preserve use of the Back and Forth navigation functions without losing data. That is what the specification identifies as the problem to be solved:

> Prior Art On-line Applications
>
> Several on-line applications are currently available, including those of InsWeb Corp., QuickenInsurance.sup.sm, eCoverage, esurance, Quicken.com, E-LOAN, and Amazon.com. While several offer graphical elements that look like tabs for triggering hyperlinks to other pages, questions, or data presentation relative to an on-line application for a service, all lack the enhanced user navigation capability provided by the present invention. *In particular, while some application data state is preserved from page to page, the prior art lacks the ability to support arbitrary re-entry of application panes and sub-panes, dynamic pane and sub-pane customization dependant on user input,* and real-time error flagging and guided user correction.

A77-78, cols. 6:62-7:7 (emphasis added). Moreover, as quoted above in detail in Section II.B, the patent gives a specific example of how the limited caching of prior art systems resulted in data loss when a user wanted to go back to a prior page and change information she had entered. A79, col. 10:4-27. Again,

therefore, The General's factual argument based on the specification plainly is wrong.

If The General believes it can prove that the Patent Office was mistaken because the claimed steps are, indeed, in the prior art, then it can raise an anticipation defense under § 102 or an obviousness defense under § 103.  Its attempt to argue that the specification *admits* that there is no invention, however, is not only legally irrelevant to a § 101 defense, but it is factually wrong.  In addition, to the extent that The General believes it can prove that the specification does not enable the claims, it can raise that defense under § 112.  But that will involve inquiry into the understanding and capability of a person of routine skill in the art. *See, e.g., Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed. Cir. 1990)("When the challenged subject matter is a computer program that implements a claimed device or method, enablement is determined from the viewpoint of a skilled programmer using the knowledge and skill with which such a person is charged.").  The § 112 enablement inquiry is not relevant to the § 101 issues involved in this appeal.

Because the independent claims of the '505 Patent are patent-eligible subject matter under § 101, their dependent claims also cannot be invalidated under § 101.  But, contrary to The General's argument, they also add patent-eligible subject matter and are not invalid for that additional reason.  The General seeks to dismiss

these dependent claims as containing "mere data-gathering steps" or "irrelevant content associated with the web page." A1061-62. The General is wrong. For example, dependent claim 2 states:

> The method of claim 1, wherein said displaying said dynamically generated on-line application form set comprises combining information from a template file and either a database or a conditional merge file or both to form said dynamically generated on-line application form.

A82, col. 16:13-17. This is not "data gathering." It is a further limitation of a "dynamically generated on-line application form set" that appears on a computer screen and can be manipulated by a user. It is a prime example of a concrete "material object" and a "specific example," characteristics that this Court has held distinguish patent-eligible subject matter from mere "abstract ideas." *Ultramercial*, 722 F.3d at 1343.

> The same is true of dependent claim 7, which states:

> The method of claim 1, wherein said web page comprises quasi-static elements distinct from said dynamically generated on-line application form set, wherein said displaying said dynamically generated on-line application form set in response to the activation of said hyperlink affects the display of said quasi-static elements.

This is not "irrelevant content associated with the web page." It is a further limitation of a "material object" and a "specific example" of what the material

object must be to infringe this claim. It is not a patent-ineligible "abstract idea."[7]

These dependent claims are not invalid under § 101 for these additional reasons.

> **4.** **The General's "Conventional Steps" Argument Depends on Factual Assumptions and Inferences That Are Not True as a Matter of Law**

As this Court held in *Ultramercial*, "the analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues." 722 F.3d at 1339. As shown above, The General was wrong in attempting to eliminate from the § 101 analysis any "conventional steps." The General compounded the error by basing its argument on factual assumptions and inferences that are not true as a matter of law and thus cannot support dismissal of IPC's complaint on a Rule 12(b)(6) motion.

The General argued that:

> IPC's patent is invalid because it attempts to preempt a desired result, unsupported by any substantive underlying steps enumerating how the desired result may be attained, and in direct violation of well-settled law. The Supreme Court in a line of cases culminating with *Mayo v. Prometheus* has repeatedly cautioned that abstract ideas such as the mere result claimed by IPC are patent-ineligible in the absence of an inventive concept, the likes of which are nowhere to be found in the '505 patent, much less in the claims at issue. The '505 patent effectively claims all solutions to a known problem in web browser navigation, while failing to adequately describe even one.

---

[7] As stated above, the dependent claims that have similar limitations to claims 2 and 7 are claims 10 and 15 (dependent on "system" claim 9) and claims 18 and 23 (dependent on "computer-readable storage medium" claim 17).

A1052-53.  This argument is "rife" with factual arguments that IPC submits are plainly wrong, but are at least based on unsupported factual assumptions.

First, the claims do, in fact, state "substantive underlying steps."  As shown above, the claims require (i) using icons hyperlinked to a dynamically generated form set; (ii) using form sets that comprise a state in response to at least one user input; and (iii) maintaining that state when another icon hyperlinked to another dynamically generated form set is activated.  The General cannot carry its burden of proving invalidity by clear and convincing evidence by merely contending that these steps are not "substantive."  At the very least, expert testimony or other technical evidence would be required to prove that, even though these appear on their face to be substantive, meaningful limitations, they somehow fail in that regard.  The General's arguments (A1057-60) that these steps were "known" or "conventional" prior to the '505 patent application is, as shown above, legally irrelevant to a § 101 analysis.  Nevertheless, it also depends on factual inferences The General seeks to draw based on selective – and misleading – quotations from the specification.  Whether or not the prior art discloses the methods and systems claimed by the '505 patent at least raises issues of fact as to what the prior art discloses.  Moreover, The General's ultimate conclusion that IPC claimed nothing that was not already known in the art flies directly in the face of the presumption of validity.

Second, to the extent that it were proper to reduce every claim to some "abstract idea" and then inquire whether it "preempts the field" and "claims all solutions to a known problem in web browser navigation," that clearly would require intense factual inquiry. As discussed above, the '505 patent solves a problem of losing data when using web browser navigation buttons. The patent claims do so by, *e.g.,* using dynamically generated form sets that comprise a certain state and maintaining that state when another icon hyperlinked to another dynamically generated form set is activated. Whether this is the only way to prevent data loss when using navigational buttons cannot be ascertained without technical evidence, most likely involving expert testimony. As this Court stated in *Ultramercial*:

> [A]ny inquiry into the scope of preemption--how much of the field is "tied up" by the claim--by definition will involve historic facts: identifying the "field," the available alternatives, and preemptive impact of the claims in that field. The presence of factual issues coupled with the requirement for clear and convincing evidence normally will render dismissal under Rule 12(b)(6) improper.

*Ultramercial*, 722 F.3d at 1339.

The factual inquiries here would have to resolve various questions. First, what is the specific "field" that IPC has allegedly "preempted"? For example, is it "efficiently filling out on-line forms," or "filling out on-line forms without losing data"? How can The General contend, without any evidence, that these fields have

been "preempted" as a matter of law?  Moreover, regardless of what the relevant

"field" is, how has The General met its clear and convincing burden of proof to

show that the only way to accomplish the claimed desired result is to do what the

claims require?  It certainly is not IPC's burden to invent – and apparently then

disclaim – other ways of solving the data loss problem.  If that were the standard

for patentability, then the most pioneering of patents would be the most suspect,

because alternatives would be less readily apparent.   In addition, IPC offered to

produce evidence that The General contended that it had successfully designed

around the '505 patent, a fact that, if true, could refute that the '505 patent

"preempts" any reasonably defined field relating to filling out online forms without

losing data when using a browser's back and forth navigation functions.  A1101,

lines 24-27.

Finally, while the "machine-or-transformation" test is not dispositive of

patentability, The General's argument on that point suffers from similar infirmities

as those discussed above.  The General argued that:

> The plain language of Claim 1 of the '505 patent does not require the
> method to be performed by a "particular machine", but merely a
> general purpose computer programmed in some unspecified fashion.
> In fact, there is no mention at all in the claim of the apparatus
> performing the method.

A1063, lines 19-22.  As shown above, the plain language of claim 1 refutes this

argument.  Claim 1 is directed to a method using a particular machine that has been

configured in a way so that the state of dynamic web pages ("form sets") based on

at least one user input is preserved when a user clicks on a new icon representing a

different web page. That is the specific way described in the claims for performing

the method (and the corresponding specific limitations in the computer system and

computer-readable storage medium claims). That is how the patent achieves the

"desired result" of preventing the frustrating data loss that resulted in prior art

systems when users filling out on-line forms used the "Back" and "Forward"

navigation functionalities of web browsers. *See* Section II.B, above.

Accordingly, the judgments should be reversed on all claims.

### D. The Judgments May be Reversed as to Claims 9 Through 16 on the Grounds That They Include Computer System Hardware and Software Components

The foregoing arguments do not make any distinction as to patent-eligible

subject matter between or among method claims 1-8, computer system claims 9-

16, or computer-readable storage medium claims 17-24. IPC has shown why these

claims all are directed to patent-eligible subject matter, regardless of their form.

Nevertheless, IPC here notes that there appears to be a split of opinion among the

judges of this Court as to whether claims that recite computer system components

may, for that reason, constitute patentable subject matter. *See, e.g., CLS Bank*, 717

F.3d at 1333-36 (additional reflections of Rader, C.J.)[8]; *Accenture,* 728 F.3d at

1346-48 (Fed. Cir. 2013) (Rader, C.J., dissenting).  IPC contends that claims 9

through16 are not invalid for the additional reasons that they claim computer

system components.

### E.     The Four Judgments Should Be Reversed and the Cases Remanded to the District Court

The General was the only one of the Defendants-Appellees to make a

motion to dismiss under 35 U.S.C. § 101.  The district court decided to adopt its

reasoning from the Order of Dismissal in that case, and to dismiss the other three

cases against Active Network, QuinStreet and Tree.com on the same patent

invalidity grounds.  A11-12; A15-16; A19-20.  The district court entered final

judgments in all three cases on that same day, October 25, 2013.  A13-14; A17-18;

A21-22.  Because The General's judgment should be reversed and remanded to the

district court, so should the Active Network, QuinStreet and Tree.com judgments.

## V.     Conclusion

For the foregoing reasons, the Court should reverse the judgments in all four

cases on the grounds that the claims of the '505 patent are directed to patent-

eligible subject matter under 35 U.S.C. § 101, and remand the cases to the district

court.  In the alternative, the Court should reverse the judgments in all four cases

---

[8] The Supreme Court has granted cert in *CLS Bank.  Alice Corp. v. CLS Bank Int'l*, 2013 U.S. Lexis 87777 (U.S., December 6, 2013).

on the grounds that there are at least genuine issues of fact as to whether the claims of the '505 patent are directed to patent-eligible subject matter, and remand the cases to the district court.

Dated: January 27, 2014                    Respectfully submitted,

                                       By: /s/ Joseph A. Greco
                                           Joseph A. Greco
                                           jgreco@beckllp.com
                                           Justin Beck
                                           jbeck@beckllp.com
                                           Kimberly P. Zapata
                                           kzapata@beckllp.com
                                           BECK, BISMONTE & FINLEY
                                           150 Almaden Blvd, 10th Floor
                                           San Jose, CA 95113
                                           (408) 938-7900

                                           *Attorneys for Internet Patents Corporation,*
                                           *f/k/a Insweb Corporation*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

| Date Filed | Dkt. No. | Docket Text | Apx. No. |
|---|---|---|---|
| 09/24/2013 | 51 | Order Granting Defendant's Motion to Dismiss in *Internet Patents Corporation v General Automobile Insurance Services, Inc., et al.*, N.D. Ca. No. 3:12-CV-0536-JSW | A1 |
| 09/24/2013 | 52 | Judgment in *Internet Patents Corporation v General Automobile Insurance Services, Inc., et al.*, N.D. Ca. No. 3:12-CV-0536-JSW | A9 |
| 10/25/2013 | 44 | Order of Dismissal in *Internet Patents Corporation v Active Network, Inc.*, N.D. Ca. No. 3:12-CV-05035-JSW | A11 |
| 10/25/2013 | 45 | Judgment in *Internet Patents Corporation v Active Network, Inc.*, N.D. Ca. No. 3:12-CV-05035-JSW | A13 |
| 10/25/2013 | 37 | Order of Dismissal in in *Internet Patents Corporation v. Quinstreet, Inc.*, N.D. Ca. No. 3:12-CV-06506-JSW | A15 |
| 10/25/2013 | 38 | Judgment in *Internet Patents Corporation v. Quinstreet, Inc.*, N.D. Ca. No. 3:12-CV-06506-JSW | A17 |
| 10/25/2013 | 44 | Order of Dismissal in *Internet Patents Corporation v Tree.com Inc.*, N.D. Ca. No. 3:CV-06505-JSW | A19 |
| 10/25/2013 | 45 | Judgment in *Internet Patents Corporation v Tree.com Inc.*, N.D. Ca. No. 3:CV-06505-JSW | A21 |
| -- | -- | U.S. Patent No. 7,707,505 B1 | A52 |

United States District Court
For the Northern District of California

1

2

3

4

5

6                          IN THE UNITED STATES DISTRICT COURT

7

8                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9  INTERNET PATENTS CORPORATION,
   f/k/a INSWEB CORPORATION,
10                                                  No. C 12-05036 JSW
                  Plaintiff,
11
        v.
12                                              ORDER GRANTING
   THE GENERAL AUTOMOBILE                       DEFENDANTS' MOTION TO
13 INSURANCE SERVICES, INC. d/b/a THE           DISMISS
   GENERAL, PERMANENT GENERAL
14 ASSURANCE CORPORATION, and
   PERMANENT GENERAL ASSURANCE
15 CORPORATION OF OHIO,

16                Defendants.
                                          /
17

18        Now before the Court is the motion to dismiss filed by Defendants, The General

19 Automobile Insurance Services, Inc., d/b/a The General, Permanent General Assurance

20 Corporation, and Permanent General Assurance Corporation of Ohio (collectively,

21 "Defendants").  Having considered the parties' papers, relevant legal authority, and the record

22 in this case, the Court finds the matter suitable for disposition without oral argument.  *See* N.D.

23 Civ. L-R 7-1(b).  Therefore, the hearing date of October 4, 2013 is HEREBY VACATED.  The

24 Court GRANTS the Defendants' motion to dismiss with prejudice.

25                                     **BACKGROUND**

26        Defendants move to dismiss this suit on the basis that the Plaintiff's patent infringement

27 claims must fail as a matter of law because the asserted patent, United States Patent No.

28 7,707,505 ("the '505 Patent") entitled "Dynamic Tabs for a Graphical User Interface," is invalid

A1

United States District Court
For the Northern District of California

1  under 35 U.S.C. § 101 for lack of patent-eligible subject matter.

2      The Court shall address additional facts as necessary in the remainder of this Order.

3  **ANALYSIS**

4  **A.     Applicable Legal Standards.**

5      A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

6  pleadings fail to state a claim upon which relief can be granted. The complaint is construed in

7  the light most favorable to the non-moving party and all material allegations in the complaint

8  are taken to be true. *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir. 1986). However, even

9  under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's

10 obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

11 conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell*

12 *Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S.

13 265, 286 (1986)).

14     Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but

15 must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at

16 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the

17 court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

18 *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009) (citing *Twombly*, 550 U.S. at 556). "The

19 plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

20 possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that are

21 merely consistent with a defendant's liability, it stops short of the line between possibility and

22 plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal

23 quotation marks omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

24 does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

25 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of

26 the elements of a cause of action will not do." *Twombly*, 550 U.S. at 544. If the allegations are

27 insufficient to state a claim, a court should grant leave to amend, unless amendment would be

28

2

A2

1    futile.  *See, e.g., Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss*

2    *& Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

3        To state a claim for patent infringement, "a patentee need only plead facts sufficient to

4    place the alleged infringer on notice.  The requirement ensures that the accused infringer has

5    sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself."

6    *Phonometrics, Inc. v. Hospitality Franchise System, Inc.*, 203 F.3d 790, 794 (Fed. Cir. 2000).

7    **B.    Patent Eligibility.**

8        **1.    Principles of Patent Eligibility and Abstractness.**

9        Under 35 U.S.C. § 101, the scope of patentable subject matter includes "any new and

10    useful process, machine, manufacture, or composition of matter, or any new and useful

11    improvement thereof."  Notwithstanding the broad scope of Section 101, there are three

12    important and judicially-created exceptions to patentability.  "Laws of nature, natural

13    phenomena and abstract ideas are not patentable." *Bilski v. Kappos*, --- U.S. ---, 130 S. Ct.

14    3218, 3225 (2010); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, --- U.S. ---, 132 S. Ct.

15    1289, 1301 (2012).  These principles are not patent-eligible because "they are the basic tools of

16    scientific and technological work," which are "free to all men and reserved exclusively to

17    none." *Mayo*, 132 S. Ct. at 1293 (citations omitted).

18        Many courts use the "machine-or-transformation" test to determine whether a patent

19    falls into one of these categorical exceptions.  Under this test, a "claimed process is surely

20    patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus; or (2) it

21    transforms a particular article into a different state or thing." *Bilski*, 130 S. Ct. at 3224

22    (citations omitted).  Although the test is not dispositive, is it still an "important and useful clue."

23    *Id*. at 3226.

24        Beyond the machine-or-transformation test, a reviewing court is obligated to "hew

25    closely to established precedents in this area to determine whether an invention falls within one

26    of the exceptions to § 101's broad eligibility." *OIP Technologies, Inc. v. Amazon.com, Inc.*,

27    2012 WL 3985118, at *5 (N.D. Cal. Sept. 11, 2012) (citing *Bilski*, 130 S. Ct. at 3231).

28    "Whether a claim recites patent-eligible subject matter is a question of law." *See id*. (citing

**United States District Court**
For the Northern District of California

3

A3

**United States District Court**
For the Northern District of California

1    *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012); *CyberSource Corp. v. Retail*

2    *Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011)).

3         The Federal Circuit has cautioned that "the 'disqualifying characteristic' of abstractness

4    must exhibit itself 'manifestly' 'to override the broad statutory categories of patent eligible

5    subject matter.'" *CLS Bank Int'l v. Alice Corp.*, 685 F.3d 1341, 1349 (Fed. Cir. 2012) (internal

6    citations omitted).  Section 101 "does not permit a court to reject subject matter categorically

7    because it finds that a claim is not worthy of a patent." *Research Corp. Techs. v. Microsoft*

8    *Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010).  The reason for the exceptions to eligibility rest on

9    the presumption undergirding the patent system, which "represents a carefully crafted bargain

10   that encourages both the creation and the public disclosures of new and useful advances in

11   technology, in return for an exclusive monopoly for a limited period of time." *Highmark, Inc.*

12   *v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1324 (Fed. Cir. 2012) (quoting *Pfaff v. Wells*

13   *Elecs., Inc.*, 525 U.S. 55, 63 (1998)).  "A patentee does not uphold his end of this 'bargain' if he

14   seeks broad monopoly rights over a basic concept, fundamental principle, or natural law without

15   a concomitant contribution to the existing body of scientific and technological knowledge." *Id.*

16        **2.    Procedural Posture and Question of Prematurity.**

17        First, Plaintiff contends that Defendants' motion to dismiss is premature because the

18   Court has not yet construed any of the claims in the disputed patent.  However, Plaintiff fails to

19   explain how a claims construction would fundamentally alter the analysis of subject matter

20   patentability.  Further, there are many courts that have considered Section 101 eligibility at the

21   motion to dismiss stage, prior to conducting a claims construction.  *See, e.g., OIP Technologies*,

22   2012 WL 3985118, at *5 (citing other cases).  Where, as here, the basic character of the claimed

23   subject matter is readily ascertainable from the face of the patent, the Court finds that it may

24   determine patentability at the motion to dismiss stage.  *See, e.g., Cardpool, Inc. v. Plastic*

25

26

27

28

4

1    *Jungle, Inc.,* 2013 WL 245026, at *4 (N.D. Cal. Jan. 22, 2013).  Accordingly, the Court finds

2    the question of patentability appropriate at this procedural posture.[1]

3        **3.    Application of Section 101 to '505 Patent.**

4        The '505 Patent claims the exclusive right to allow the use of a conventional web

5    browser Back and Forward navigational functionalities without data loss in an online

6    application consisting of dynamically generated web pages.  (Patent at Abstract.)  The '505

7    Patent also discloses an intelligent user interface for "re-entrant editing; error trapping,

8    flagging, and correction" although these applications are not specifically claimed.  (*Id.*)  The

9    Patent identifies the problem of a user having to re-enter all or part of the information required

10   by an online application, in this case for applications to receive insurance.  To differentiate

11   itself from the prior art, the Patent allegedly expands on the conventional aspects of the then-

12   current multi-page online application forms by "maintain[ing] virtual applications information,

13   relative dependencies, and information context obtained and/or derived from each pane by the

14   user/applicant."  ('505 Patent at 9:60-63.)  On its face, the '505 Patent purports to propose a

15   solution to a well-known problem regarding user navigation in online multi-page application

16   forms.  However, the Patent does not actually disclose or recite an example of the solution to

17   this problem.  The mere abstract idea that an invention could address the challenges of retaining

18   information lost in the navigation of online forms fails to satisfy the requirements of

19   patentability and renders the Patent is ineligible under § 101.  The Court finds that by setting

20   out the abstract idea of a known technological challenge without setting out any specific

21   disclosures, the Patent "added no elements or combination of elements, sometimes referred to as

22   the inventive concept, sufficient to ensure that the patent in practice amounts to significantly

23   more than a patent upon the natural law [or the abstract idea]."  *Mayo,* 132 S. Ct. at 1294.

24

25

26

27        [1]  In addition, the Court finds Plaintiff's argument that the Court should wait until
     resolution of the *en banc* appeal in *CLS Bank* unavailing as the current state of the law
28   provides that Defendants' motion to dismiss is not premature.  (*See* Opp. Br. at 7-10, citing
     *CLS Bank Int'l v. Alice Corp.,* No. 11-1301 (Fed. Cir. argued Feb. 8, 2013).)

A5

United States District Court

For the Northern District of California

4.      **Machine-or-Transformation Test.**

In response to the argument that the Patent merely recites the challenge, but fails to propose a discrete and new technological solution, Plaintiff contends that its claims are patent-eligible under the machine-or-transformation test based on the position that each claim and the desired result require computer implementation.  However, the "mere implementation on a computer of an otherwise ineligible abstract idea will not render the asserted 'invention' patent eligible."  *CLS Bank*, 685 F.3d at 1351 (citing *Fort Properties Inc. v. American Master Lease LLC*, 671 F.3d 1317, 1322 (Fed. Cir. 2012) ("[A]n abstract concept cannot be transformed into patentable subject matter merely because of connections to the physical world."); *see also Dealertrack*, 674 F.3d at 1333 ("Simply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible.").

Here, although the platform of the invention is computer-based as the technology relates to online applications systems, Plaintiff has failed to show how the desired result of the patent is coupled with or integrated into a specific process.  The addition of a computer limitation does not transform the abstract idea into a patentable invention.

Accordingly, Plaintiff's claims fail as a matter of law because the asserted patent is invalid under 35 U.S.C. § 101 for lack of patent-eligible subject matter.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED with prejudice. A separate judgment shall issue and the Clerk shall close the file.  In addition, because the patent upon which the related cases are dependent has been declared invalid, the Court shall issue orders to show cause in those matters regarding dismissal for invalidity (cases nos. 12-5035 JSW, 12-6505 JSW, and 12-6506 JSW).  *See Barkeij v. Lockheed Aircraft Corp.*, 201 F.2d 1, 2 (9th Cir. 1954) (citations omitted) (holding that "it is the duty of the court to dismiss a

///

///

///

///

6

A6

1   patent infringement suit whenever it affirmatively appears that the patent is invalid.").

2      **IT IS SO ORDERED.**

3

4   Dated:   September 24, 2013

5                                    JEFFREY S. WHITE
                                     UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

7

A7

United States District Court

For the Northern District of California

1

2

3

4

5

6                 IN THE UNITED STATES DISTRICT COURT

7

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9  INTERNET PATENTS CORPORATION,
    f/k/a INSWEB CORPORATION,

10                        No. C 12-05036 JSW

          Plaintiff,

11

    v.

12                       **JUDGMENT**

    THE GENERAL AUTOMOBILE

13  INSURANCE SERVICES, INC. d/b/a THE
    GENERAL, PERMANENT GENERAL

14  ASSURANCE CORPORATION, and
    PERMANENT GENERAL ASSURANCE

15  CORPORATION OF OHIO,

16         Defendants.

17  ————————————————————/

18      Pursuant to the Court's Order granting Defendants' motion to dismiss, it is HEREBY

19  ORDERED AND ADJUDGED that judgment is entered in favor of Defendants and against

20  Plaintiff.

21

22  Dated:  September 24, 2013

23                           JEFFREY S. WHITE
                           UNITED STATES DISTRICT JUDGE

24

25

26

27

28

A9

A10

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTERNET PATENTS CORPORATION,

        Plaintiff,                     No. C 12-05035 JSW

    v.

ACTIVE NETWORK, INC.,                **ORDER OF DISMISSAL**

        Defendant.

                                 /

        In a related matter pending before this Court, Case No. 12-5036 JSW, the Court dismissed the suit based on the finding that Plaintiff's claims fail as a matter of law because the asserted patent, United States Patent No. 7,707,505 ("the '505 Patent") entitled "Dynamic Tabs for a Graphical User Interface" is invalid under 35 U.S.C. § 101 for lack of patent-eligible subject matter. On October 24, 2013, Plaintiff in that matter noticed its appeal of that decision.

        It "is the duty of the court to dismiss a patent infringement suit whenever it appears that the patent is invalid." *Barkeij v. Lockheed Aircraft Corp.*, 201 F.2d 1, 2 (9th Cir. 1954) (citations omitted). Accordingly, this Court issued an order to show cause to Plaintiff as to why this related matter premised upon the same patent should not be dismissed. In response, the Court received essentially an improper motion for reconsideration of its opinion re invalidity. The Court finds the response to the order to show cause unpersuasive. This matter is dismissed as it is premised upon the assertion of a patent the Court has determined to be invalid.

        **IT IS SO ORDERED.**

Dated:   October 25, 2013

                                 JEFFREY S. WHITE
                                 UNITED STATES DISTRICT JUDGE

A12

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTERNET PATENTS CORPORATION,

         Plaintiff,                No. C 12-05035 JSW

    v.

ACTIVE NETWORK, INC,..,            **JUDGMENT**

         Defendant.

_____/

    Pursuant to the Court's Order granting Defendants' motion to dismiss in a related matter (12-5036 JSW) and its finding of invalidity of the asserted patent, it is HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of Defendants and against Plaintiff.

    **IT IS SO ORDERED.**

Dated:   October 25, 2013

                                 JEFFREY S. WHITE
                                 UNITED STATES DISTRICT JUDGE

A13

**United States District Court**
For the Northern District of California

1
2
3
4
5            IN THE UNITED STATES DISTRICT COURT
6
7           FOR THE NORTHERN DISTRICT OF CALIFORNIA
8 INTERNET PATENTS CORPORATION,
9         Plaintiff,                 No. C 12-06506 JSW
10    v.
11 QUINSTREET, INC.,             **ORDER OF DISMISSAL**
12         Defendant.
13 _____/
14        In a related matter pending before this Court, Case No. 12-5036 JSW, the Court
15 dismissed the suit based on the finding that Plaintiff's claims fail as a matter of law because the
16 asserted patent, United States Patent No. 7,707,505 ("the '505 Patent") entitled "Dynamic Tabs
17 for a Graphical User Interface" is invalid under 35 U.S.C. § 101 for lack of patent-eligible
18 subject matter.  On October 24, 2013, Plaintiff in that matter noticed its appeal of that decision.
19        It "is the duty of the court to dismiss a patent infringement suit whenever it appears that
20 the patent is invalid." *Barkeij v. Lockheed Aircraft Corp.*, 201 F.2d 1, 2 (9th Cir. 1954)
21 (citations omitted).  Accordingly, this Court issued an order to show cause to Plaintiff as to why
22 this related matter premised upon the same patent should not be dismissed.  In response, the
23 Court received essentially an improper motion for reconsideration of its opinion re invalidity.
24 The Court finds the response to the order to show cause unpersuasive.  This matter is dismissed
25 as it is premised upon the assertion of a patent the Court has determined to be invalid.
26     **IT IS SO ORDERED.**
27 Dated:   October 25, 2013
28                                _____
                                  JEFFREY S. WHITE
                                  UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

1

2

3

4

5            IN THE UNITED STATES DISTRICT COURT

6

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8 INTERNET PATENTS CORPORATION,

9         Plaintiff,                 No. C 12-06506 JSW

10    v.

11 QUINSTREET, INC.,              **JUDGMENT**

12         Defendant.

13 _____/

14       Pursuant to the Court's Order granting Defendants' motion to dismiss in a related matter

15 (12-5036 JSW) and its finding of invalidity of the asserted patent, it is HEREBY ORDERED

16 AND ADJUDGED that judgment is entered in favor of Defendants and against Plaintiff.

17       **IT IS SO ORDERED.**

18 Dated:    October 25, 2013

19                                 JEFFREY S. WHITE
                                  UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

A17

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTERNET PATENTS CORPORATION,

        Plaintiff,                     No. C 12-06505 JSW

    v.

TREE.COM, INC.,                  **ORDER OF DISMISSAL**

        Defendant.

_____/

    In a related matter pending before this Court, Case No. 12-5036 JSW, the Court dismissed the suit based on the finding that Plaintiff's claims fail as a matter of law because the asserted patent, United States Patent No. 7,707,505 ("the '505 Patent") entitled "Dynamic Tabs for a Graphical User Interface" is invalid under 35 U.S.C. § 101 for lack of patent-eligible subject matter. On October 24, 2013, Plaintiff in that matter noticed its appeal of that decision.

    It "is the duty of the court to dismiss a patent infringement suit whenever it appears that the patent is invalid." *Barkeij v. Lockheed Aircraft Corp.*, 201 F.2d 1, 2 (9th Cir. 1954) (citations omitted). Accordingly, this Court issued an order to show cause to Plaintiff as to why this related matter premised upon the same patent should not be dismissed. In response, the Court received essentially an improper motion for reconsideration of its opinion re invalidity.

1    The Court finds the response to the order to show cause unpersuasive.  This matter is dismissed

2    as it is premised upon the assertion of a patent the Court has determined to be invalid.

3         **IT IS SO ORDERED.**

4    Dated:    October 25, 2013

5                                                                    JEFFREY S. WHITE
                                                                     UNITED STATES DISTRICT JUDG

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

2

A20

**United States District Court**
For the Northern District of California

1

2

3

4

5

6 IN THE UNITED STATES DISTRICT COURT

7

8 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9 INTERNET PATENTS CORPORATION,

10            Plaintiff,                    No. C 12-06505 JSW

11    v.

12 TREE.COM, INC.,                **JUDGMENT**

13            Defendant.

14 _____/

15      Pursuant to the Court's Order granting Defendants' motion to dismiss in a related matter

16 (12-5036 JSW) and its finding of invalidity of the asserted patent, it is HEREBY ORDERED

17 AND ADJUDGED that judgment is entered in favor of Defendants and against Plaintiff.

18      **IT IS SO ORDERED.**

19 Dated:   October 25, 2013                _____

20                                  JEFFREY S. WHITE

                                UNITED STATES DISTRICT JUDG

21

22

23

24

25

26

27

28

A21

Case3:12-cv-06505-JSW   Document45   Filed10/25/13   Page2 of 2



US007707505B1

(12) **United States Patent**
Ohrt et al.

(10) Patent No.: **US 7,707,505 B1**
(45) Date of Patent: **Apr. 27, 2010**

(54) **DYNAMIC TABS FOR A GRAPHICAL USER INTERFACE**

(75) Inventors: **Curtis K. Ohrt**, Redwood City, CA (US); **Michael R. Martin**, San Mateo, CA (US); **Xiaofeng Ma**, Walnut Creek, CA (US); **Robert J. Dugan**, San Jose, CA (US); **Steven Horio**, Mountain View, CA (US); **Sridhar Gunapu**, Sunnyvale, CA (US); **Deepankar Narayanan**, Santa Clara, CA (US)

(73) Assignee: **InsWeb Corporation**, Gold River, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1826 days.

(21) Appl. No.: **09/534,647**

(22) Filed: **Mar. 23, 2000**

(51) **Int. Cl.**
*G06F 3/00* (2006.01)

(52) **U.S. Cl.** .................................................. **715/738**

(58) **Field of Classification Search** ................ 715/738;
707/3, 505, 906, 501.1, 507; 345/968
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,897,622 A | * | 4/1999 | Blinn et al. .................. 705/26 |
| 6,023,684 A | | 2/2000 | Pearson ..................... 705/35 |
| 6,141,006 A | * | 10/2000 | Knowlton et al. ........... 345/835 |
| 6,199,099 B1 | * | 3/2001 | Gershman et al. .......... 345/966 |

| | | | |
|---|---|---|---|
| 6,424,360 B1 | * | 7/2002 | Torres ....................... 345/810 |

OTHER PUBLICATIONS

http://www.insuremarket.com; QuickenInsurance—life and auto insurance quotes; pp. 1, 2; Mar. 19, 2000.
http://www.ecoverage.com; Ecoverage, Copyright 2000, eCoverage P&C Insurance Services, Inc., p. 1, Mar. 19, 2000.
https://www.esurance.com/default.asp?&XZO=XZO &ZZZESURANCESESS.../default.asp&ZZZCOOKIFID=4011; esurance, Copyright 2000 e-Surance™ all rights reserved; p. 1, Mar. 19, 2000.
http://quickenloans.quicken.com/; Quicken.com.p. 1; Mar. 19, 2000.
Http://www.eloan.com/; E-Loan, p. 1, Mar. 19, 2000.
http://www.amazon.com/exec/obid__s/subst/home/home.html/102-8347878-94680; Amazon.com, p. 1, 2; Mar. 19, 2000.

* cited by examiner

*Primary Examiner*—Stephen S Hong
*Assistant Examiner*—Le Nguyen

(57) **ABSTRACT**

A dynamic, intelligent user interface for an on-line, virtual application whereby user input customizes the subsequent display of application data and queries presented to the user/applicant. The present invention includes a facility for intelligent editing, data state presentation, and error flagging and correction. In one embodiment of the present invention, the intelligent user interface is implemented as part of a series of dynamically generated web pages (a form set) presented to a user of an ecommerce Internet web site. This presentation is in the form of a collection of tabbed panes of data, the selected pane being displayed on a web page, wherein each pane contains one or more pages of data and queries. This organization and presentation of the virtual application provides re-entrant editing; error trapping, flagging, and correction; and easy navigation from sub-pane to sub-pane (page to page) within each pane and from pane to pane using the tabs and conventional browser Back and Forward button functionality.

**24 Claims, 22 Drawing Sheets**





*FIG. 1 (Prior Art)*



*FIG. 2A*



*FIG. 2B*



FIG. 2C



Process Repeats

HyperText Template (HTT) File 240

Conditional Merge (MRG) Files 250

Executable 230

Page requested by user

Processed HTML Document (exists as a virtual file in memory) 260

*FIG. 2D*

Page delivered back to user

Case: 14-1048 Case: 14-1048 CASE PARTICIPANTS ONLY Document: 7 Document: 16 Page: 87 Filed: 01/29/2014 Filed: 01/27/2014



**FIG. 3**



FIG. 4A



*FIG. 4B*



*FIG. 5*

A60

*FIG. 6*

*FIG. 7*

*FIG. 8*



*FIG. 9*

**≽INSWEB**
Where You And Your Insurance Really Click™

Have Questions?
See our *Live Help Options*     Live Help

| Start | State | Drivers | **Vehicles** | Usage | Discounts | Coverage | Quotes |

**▸ Vehicle #1 Info**

**Vehicle Information**

1989 Toyota, Long Bed Deluxe 4WD          Change

**Purchase and Finance Information**

Date purchased/leased:   MM  YYYY
                         03 / 1992

Cost new (approximate):  $ 17800       .00

Term length if financed or leased:   N/A - wholly owned. ▾

**Registration Information**

Registered to:   Self ▾

Registered state:   California ▾

City where parked overnight (must be in CA):   San Jose

Zip Code where parked overnight (must be valid for City):   95131

Garage type:   Full Garage ▾

**Special Vehicle Considerations**

Manufactured for use outside US; Considered a classic;
Custom equipment modifications; Extensive unrepaired damage;   ○ Yes  ● No
Has vehicle ever been stolen:

**Special Equipment**

Canopy/Camper Tops; Custom Painting; Special Wheels/Rims;
Stereo equipment over $350; Custom Body Work;   ○ Yes  ● No
Van Modifications; Winch

**Additional Equipment**

Security System:   Alarm Only ▾

4 wheel drive:   ● Yes  ○ No

Anti-lock brakes:   All-wheel Anti-Lock ▾

Automatic seat belts:   ● Yes  ○ No

Airbags:   Driver's and Passenger's Side Only ▾

Check here to save your information □

Continue

*FIG. 10*



FIG. 11

*FIG. 12*



*FIG. 13*

**FIG. 14**

*FIG. 15*

FIG. 16



*FIG. 17*

*FIG. 18*



*FIG. 19*

US 7,707,505 B1

# 1

## DYNAMIC TABS FOR A GRAPHICAL USER INTERFACE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the patent and trademark office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to computers and, more particularly, to computer-implemented systems for interfacing with application forms over on Internet or intranet.

### 2. Description of the Related Art

Computer systems are routinely used to generate insurance quotes based on information provided by the insured. The information that is provided by the insured varies depending on both the subject of the insurance policy to be underwritten and the type of coverage desired. For instance, in the case of automobile insurance the information provided by the insured includes information about the vehicle or vehicles to be covered under the policy, the driver or drivers to be covered under the policy, and the type of coverage requested by the insured.

Since insurance quotes are typically based on statistical data which is correlated to the information provided by the insured, computers can greatly reduce the time and expense associated with generating insurance quotes. In particular, computer quoting systems allow insurance agents to provide accurate quotes to potential clients in a matter of minutes by inputting the client's information into the system and automatically generating quotes based on the information provided by the client.

The increasing popularity of the Internet and the World Wide Web (the web) have led to the development of automated insurance quoting systems that are accessible directly over the web. Operation of one such system is illustrated in FIG. 1, a computer program is first executed in stage 110, whereby information is collected from a user of a client computer connected to a server computer via the Internet. The information collected in stage 110 varies accordingly to the type of insurance quote requested by the user (e.g., automobile, homeowner, life, health) and may include information about the user (e.g., name, address, date of birth), information about the subject of the insurance policy to be underwritten (e.g., automobile information for auto insurance, medical history for health insurance) and information about the type of coverage requested (e.g., deductible amount, maximum liability). In stage 120, the computer program evaluates the information provided by the user and generates a number of insurance quotes by comparing the information provided by the user with insurance rate information provided by insurance carriers.

A quote pad page is then presented to the user in stage 130. The quote pad page contains information about both on-line and off-line quotes available to the user. On-line quotes can be presented directly to the user by the computer program, while off-line quotes are sent to the user by alternate means such as e-mail or regular mail at a later time. In stage 150, the user elects whether to receive off-line quotes, in which case operation 100 proceeds to stage 152. Otherwise, if the user elects to receive on-line quotes, operation 100 proceeds to stage 190.

In addition, during stage 130, the user can opt to save the information already entered for use at a later time by accessing an account creation page in stage 140.

In stage 152, off-line quoting, the user enters additional personal contact information. Stage 154 then determines whether any agents are able to provide a quote to the user, in which case operation 100 proceeds to stage 160; otherwise operation 100 proceeds to stage 170. In stage 160, an agent selection page is presented to the user. The user then selects an agent from whom to receive an off-line quote. The user information is then sent to the selected agent who, in turn, sends a quote to the user, typically, by mail.

In case the user elects to receive on-line quotes from companies that do not require agents to present quotes, a page displaying the quote details is presented to the user in stage 190. If the user then elects to request coverage, personal contact information is entered by the user in stage 195 and forwarded to the quoting insurance company for further processing of the insurance application. Operation 100 then proceeds to stage 170.

Finally, in stage 170, a thank you page is presented to the user summarizing the quotes presented and providing the user with a further option for storing the information entered by accessing the account creation page in stage 180.

This system, however, presents some limitations. The process used in the prior art to fill out the application is essentially linear, and this has caused some confusion among applicants and users of the system who want to make changes in information already entered. Specifically, those wishing to comparison shop for insurance covering a variety of situations (for example, different drivers or cars on an automobile policy or different residence locations on a homeowners policy) have been frustrated by having to re-enter all or part of the information required in the application.

Furthermore, the common convenience of the "Back" and "Forward" buttons (provided in all well-known Internet browsers) generally does not function properly when filling in on-line forms. Information is often lost when attempting to use the Back and Forward buttons to navigate within a multi-page virtual (on-line) form, particularly when using so-called "secure" forms such as those commonly employed in on-line ecommerce transactions.

What is needed is an intelligent on-line application form set that automatically configures itself, the questions it asks, and the data it displays in response to user/applicant input. Such an intelligent on-line application must also properly trap and handle user errors. Such trapping should include alert the user in a timely manner and provide an easy way to correct all errors.

Such an intelligent application would better personalize the on-line application process. It should allow easy navigation between arbitrary web pages and/or sections of the virtual application, including conventional use of browser Back and Forward navigation button functions.

## SUMMARY

A dynamic, intelligent user interface for an on-line (virtual) application whereby user input customizes the subsequent display of application data and queries presented to the user/applicant. The present invention includes, in some embodiments, a facility for intelligent editing, data state presentation, and error flagging and correction. In one embodiment of the present invention, the intelligent user interface is implemented as part of a series of dynamically generated web

US 7,707,505 B1

3

pages (a form set) presented to a user to an ecommerce Internet web site. This presentation is in the form of a collection of tabbed panes of data, the top-most selected pane being displayed on a web page, wherein each pane contains one or more pages of data and queries. This organization and presentation of the virtual application provides a means for re-entrant editing; error trapping, flagging, and correction; and easy navigation from sub-pane to sub-pane (page to page) within each pane and from pane to pane using the tabs and conventional browser Back and Forward button functionality.

BRIEF DESCRIPTION OF THE DRAWINGS

The present disclosure may be better understood and its numerous features and advantages made apparent to those skilled in the art by referencing the accompanying drawings.

FIG. 1 is a flow diagram of the operation of a prior art automated insurance quoting system.

FIGS. 2A and 2B are a high-level schematic view of a client-server computer system according to one embodiment of the present invention.

FIGS. 2C and 2D illustrate the operation of a computer system according to one embodiment of the present invention.

FIG. 3 is a schematic illustration of a web browser displayed page according to one embodiment of the present invention.

FIGS. 4A and 4B are state diagram of a virtual application process according to one embodiment of the present invention.

FIG. 5 is a screen shot of the Start pane of an intelligent user interface according to one embodiment of the present invention.

FIGS. 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16 are screen shots of the various panes and sub-panes of an intelligent user interface according to one embodiment of the present invention.

FIG. 17 is a screen shot of a pane containing a flagged error according to one embodiment of the present invention.

FIG. 18 is a screen shot of a pane containing a flagged error according to an alternate embodiment of the present invention.

FIG. 19 is a high-level flowchart of a representative virtual automobile insurance application, according to one embodiment of the present invention.

The use of the same reference symbols in different drawings indicates similar or identical items.

DETAILED DESCRIPTION

Introduction

One implementation of a computer system according to an embodiment of the invention is described in FIGS. 2A and 2D. FIGS. 2A and 2B illustrate a client computer 200 executing a web browser program connected to a server computer 210 over a global network 220 such as the Internet and/or the web. FIG. 2B illustrates the logical structure of the hardware and software of client computer 200. In FIG. 2B, a web browser program such as Internet Explorer 5.0, available from Microsoft Corporation of Redmond Wash., or Netscape Navigator® 4.0, available from Netscape Communications Corp. of Mountain View, Calif., is shown executing on top of an operation system such as Windows95®, Windows98®, Windows NT® 4.0, available from Microsoft Corporation of Redmond Wash., or MacOS™ 8.5, available from Apple

4

Computer, Inc. of Cupertino Calif. The operating system is, in turn, executing on top of the actual hardware of client computer 200 (FIG. 2A).

FIGS. 2C and 2D illustrate the operation of the software program executed by server computer 210. As shown in FIG. 2C, a user accesses the automated insurance quoting system by first requesting the "home page" of the automated insurance quoting service via client computer 200 connected to server computer 210. An executable program 230 running on server computer 210 then retrieves a hypertext template (HTT) file 240, also stored on the server computer, and one or more conditional merge files 250. Conditional merge files 250 store information such as individual insurance companies' value propositions or state-specific or partner-specific information that is dependent on other data previously entered by the consumer that may vary within an HTT file 240.

Executable program 230, HTT file 240, and conditional merge files 250 are protected by means of a network firewall installed on server computer 200 to prevent unauthorized access to sensitive information such as insurance rating information. Executable program 230 then merges HTT file 240 and merge files 250 to generate processed HTML document 260, which is then displayed on a screen of client computer 200.

FIG. 2D illustrates how the user accesses additional pages in a similar manner to the manner shown in FIG. 2C.

MacOS is a trademark of Apple Computer, Inc. of Cupertino, Calif., Windows95, Windows98 and Windows NT are registered trademarks of Microsoft Corporation of Redmond, Wash., Netscape and Netscape Navigator are registered trademarks of Netscape Communications Corp. of Mountain View, Calif.

The enhanced intelligent user interface for on-line requests or applications of the present invention consists of several elements, including a virtual application and a database. The virtual application is actually a set of logical forms, where each logical form presents information to and queries the user (i.e., the applicant for services or the requestor of data and/or products) for certain input information. These logical forms are comprised of hypertext template files and conditional merge files that are processed as described above to produce an HTML document that is displayed to the user in a conventional browser window. The database, which is not directly presented, contains both the information input by the user and error checking parameters used to determine if the user has mis-entered or failed to enter data. The database, which may be any conventional database including but not limited to computer codes for the generation of dynamic web pages using a mixture of static and dynamic data elements, provides the text and graphics (if any) used to query the user for information in each logical form.

In one embodiment of the present invention, the database and other elements of the software program executed by server computer 210 are written in the C++ programming language. One of ordinary skill in the art of course recognizes that other programming languages, including but not limited to Java and hypertext markup language (HTML) may be used. Accordingly, the present invention is not limited to any one form of programming or hypertext markup language.

In one embodiment of the present invention, the virtual application is presented by the intelligent user interface as a web page containing a number of tabbed panes. FIG. 3 shows an example of such a presentation. Web page 310, as displayed by a conventional web browser, consists of displayed pane 320 and its corresponding tab 322. Each pane represents a logical form within the virtual application. Also displayed

US 7,707,505 B1

5

are tabs **332**, **342**, **352**, and **362**, each corresponding to a different logical form pane in the set of logical forms that define the entire virtual application.

The display also includes quasi-static elements **370-373**, which do not necessarily vary with changes in the displayed pane. For example, advertising banner **371** may be static, animated, or variable depending on user information as conventionally seen in the web art.

Each tabbed pane may require several browser screens of data to present the necessary queries and information relating to the logical form. Each screen or frame of data is referred to here as a sub-pane. A "Continue" button **380** (where present) prompts the user to step to the next sub-pane of information in the logical form. As will be appreciated by one of ordinary skill in the art, tabs **322**, **332**, **342**, **352**, and **362** and the Continue button **380** are all associated with hyperlinks that cause the display of a new data in displayed pane **320**. One of ordinary skill in the art will further appreciate that this new display may be performed by any of several well-known web programming techniques, including but not limited to framing displayed pane **320** or another sub-pane of displayed pane **320** within web page **310** or rendering an entirely new web page **310** containing a new sub-pane and some or all of the quasi-static elements **370-373** previously displayed.

Not only are the queries and information in each pane and sub-pane of a logical form dynamically determined based on user input information, but the tabs themselves (both the quantity of panes and the name of each pane) can be self-configuring based on the user input. For example, in a case where the virtual application is an on-line application for auto insurance, the applicant's state of residence is used to determine if one or more affinity discounts may be available. Accordingly, once the applicant enters his or her state of residence in the appropriate logical form, the process determines if an affinity discount is available in that state and displays a new tab (and thus a link to a new logical form pane) entitled, in one embodiment of the present invention, "Discounts." Selection of the Discounts tab will then display a new pane containing additional information and/or queries to determine applicant eligibility for a discount.

Although pane navigation tabs are described as located on the top edge of the pane, those skilled in the art will realize that such tabs may be placed anywhere within displayed web page **310**. In particular, but without limitation, tabs may be placed along any outer edge (top, bottom, or either side, or any combination thereof) of displayed pane **320**. Additionally, tabs may be displayed on any inner edge of combination of inner edges of web page **310**, all of which placements are commonly known and used in the web arts. Accordingly, the invention is not limited to any particular type of tab placement.

Furthermore, while a tab iconography is described herein, one of ordinary skill in the art can readily set that any number of icons or symbols representing a one-of-many selection, such as exclusive check boxes or radio buttons, may also be employed instead of or in combination with the presently described tabs. Accordingly, the invention is not limited to any particular type of tab iconography.

FIG. **4** shows a state diagram representing the progress of an applicant/user through a virtual automobile insurance application according to some embodiments of the present invention. (For clarity of presentation, FIG. 4 is split into two parts, 4A and 4B).

The process begins from the default (Start) page **410**. The user either retrieves his or her previously stored information as a returning (existing) user **412** or logs in **414**. The login

6

process **414** for new users includes display of the State pane and querying the user for state of residence information.

If an existing user is returning to complete an application (or to continue comparison shopping for quotes), the driver summary sub-pane **420** (within the Driver(s) pane form set) is displayed. The user may either delete a driver **422**, add or change driver information **425**, or proceed to the vehicle information form set **430** or **435** (further discussed below).

If there is no previous driver information in the system, as in the case of a new user, the initial Driver(s) pane **425** is displayed and the user is queried to enter his or her driver information. Once all driver information is successfully entered, the driver summary sub-pane **420** is displayed. If supplemental information on a driver is needed, a driver supplement sub-pane (or panes) **427** is displayed.

When the user selects the Continue button from the driver summary sub-pane **420** (or if the "Vehicle" tab is selected), the vehicle summary sub-pane **435** is displayed if information on at least one vehicle is found in the database. The user then has the opportunity to delete a vehicle **427**, add or change vehicle information **433** or proceed to the Coverages sub-pane **440**.

If no vehicle information is in the database (i.e., it is the first time that the user has reached this part of the application process), the vehicle lookup sub-pane **430** is displayed to query the user for type of vehicle. This process is iterative for however many vehicles the user wishes to insure. Specific vehicle information (e.g., model year, and accessories) is queried in Vehicle sub-pane(s) **433**.

The Coverages tab and associated pane **440** allows the user to select from a variety of offered insurance coverage for the driver(s) and vehicle(s) specified. However, if the user's selections and supplied information do not match the offerings of any company, a "Sorry" message **442** is displayed. At this point, the user can either exit to the "Thank You" sub-pane **499** or select additional companies and/or activate a QuoteWatch feature that monitors changes in insurance company offerings for products that match the user's needs. The latter choice provides a list of resources **450** to the user and supports printing **452** of that list.

Returning to Coverages pane **440**, several other possible conditions must be considered. If the user is in a state that affords affinity discounts, the Discounts tab **444** is displayed and the user is queried for discount eligibility according to his or her membership in certain enumerated affinity groups, such as those listed in FIG. **14**. This process is iterative for all affinity groups to which the user may belong. When the user chooses to leave the affinity Discount pane, or if the user does not belong to any of the listed affinity groups, the process displays a list of companies offering insurance products matching the user's needs **446** or the Sorry message **442**.

Depending on whether the user selects companies offering on-line quotes or off-line quoting companies (or no companies at all), the process next displays either quote pad **460** or Thank You sub-pane **499**. From quote pad **460**, the user may either view quote details **462** or conclude the process at Thank You sub-pane **499**. The user viewing quote details **462** may also choose to enter sufficient personal information **464** to "Instant Buy" (purchase) the selected insurance coverage on-line **466**.

Prior Art On-line Applications

Several on-line applications are currently available, including those of InsWeb Corp., QuickenInsurance℠, eCoverage, esurance, Quicken.com, E-LOAN, and Amazon.com. While several offer graphical elements that look like tabs for triggering hyperlinks to other pages, questions, or data presenta-

A77

US 7,707,505 B1

7

tion relative to an on-line application for a service, all lack the enhanced user navigation capability provided by the present invention. In particular, while some application data state is preserved from page to page, the prior art lacks the ability to support arbitrary re-entry of application panes and sub-panes, dynamic pane and sub-pane customization dependant on user input, and real-time error flagging and guided user correction.

Representative Embodiment: Auto Insurance Virtual Application

Although a virtual automobile insurance application is described, those skilled in the art will realize that virtual applications other than those for auto insurance or even insurance can be created according to the presently disclosed invention. Accordingly, the invention is not limited to any particular type of insurance application or to applications for a service at all. Virtual, on-line applications for apparatus, product, or materials fabrication or delivery, as well as requests for any type of service to be performed are all equally within the scope of the present disclosure.

FIG. 5 shows a web page 510 containing the default or "Start" pane 520 of a virtual application for auto insurance coverage from an on-line insurance quote system such as that offered by InsWeb Corporation. There are eight tabs 522, 532, 542, 552, 562, 572, 582, and 592 in the auto insurance virtual application: Start, State, Drivers, Vehicles, Usage, Discounts, Coverage, and Quotes (respectively). With the exception of the Discounts tab 572, all the tabs will appear at the top of the page while the user is in the auto application. The functionality of the Discounts tab 572 is discussed below.

Each form set in the auto insurance virtual application is associated with a specific tab and therefore displayed in a separate pane. In the example of FIG. 5, the form set for the start tab is small and is completely displayed in pane 520. The rest of web page 510 (i.e., other than the tabs and pane 520) consists of quasi-static elements such as sweepstakes advertisement 571, TrustE certificate 572, legal and copyright notice 573, and promotion 574.

As can be seen from this example, the pane and its associated form set can be of any physical size relative to the displayed web page. Here, Start pane 520 is a small subset of the area of web page 510. As will be seen in the examples that follow, a pane may also consume of all of the area of web page 510 and, in addition, requires several sub-panes each also filling web page 510 in order to present the complete form set for that pane.

FIGS. 6 through 16 show the panes corresponding with each tab, and, (where applicable) the sub-panes used to display and gather additional information, according to one embodiment of the present invention. Multiple sub-panes are provided for some of the longer form sets; see, e.g., FIGS. 9, 11, and 13.

Dynamic Tabs

Affinity discounts are currently only available in certain "affinity" states. Therefore, users (also referred to as consumers) in non-affinity states do not need to see the Discounts tab. The Discounts tab is dynamically controlled so that it only appears to user/applicants who are in affinity states. Since the process cannot determine the Policy State (i.e., the geopolitical, as opposed to logical, state in which the policy will be issued) until the State page has been completed, the process cannot show the Discounts tab to any users until after the State page is displayed and completed.

Procedurally, the decision logic behind the dynamic display of the Discount tab, and indeed any tab whose appearance is determined by user input or action, is as follows:

8

1. Do not display the Discounts tab on the Start or State pages.

2. If the consumer selects an affinity state on the State page (i.e., in the State pane), include the Discounts tab on all subsequent pages where the tab navigation bar is displayed.

3. If the consumer selects a non-affinity state on the State page, do NOT display the Discounts tab on subsequent pages.

4. If the consumer clicks on the Continue button or Returning User button on the Start page, evaluate the state the consumer previously selected on the State page to determine whether or not the Discount tab will be shown.

5. This affinity state verification process should occur every time a consumer changes the criteria used, to determine the Discount Tabs presence. This ensures proper performance if the consumer changes their Policy State multiple times during the same shopping session.

6. If the consumer changes from a state that had affinity programs to a state that has no affinity programs, whatever affinity group data the consumer previously entered should be discarded.

7. If the consumer changes from a state that had no affinity programs to a state that has affinity programs, the new tab will appear and the consumer will proceed through the page in the normal course of events. Do not force the consumer to the Discounts page via error processing because this particular set of data is optional.

8. If the consumer remains in the same state but InsWeb has added a Discount tab in that state, the process will behave as if the consumer changed to a state that has affinity programs.

9. If the consumer remains in the same state but InsWeb has removed the discount tab in that state, the process will behave as if the consumer changed to a state that does not have affinity programs.

10. If the consumer remains in the same state but InsWeb has added or deleted affinity group programs from that state, without changing whether or not the tab appears, the consumer will not be forced to go back to the Discounts pane as the page is optional and any groups that no longer apply to this user would have been discarded.

Tab Navigation

Tabs do not provide true random access to information; access is still constrained somewhat by linearity of the application process as driven by its internal data dependencies. However, tabs will allow the user much more flexibility in navigation once the core information is provided. In general, a user cannot access a tab if they have not successfully completed all previous tabs but the user can access tabs that have already been successfully completed.

Table 1 describes possible tab states for each tab and the associated actions available in each state.

TABLE 1

| Tab State | Description | Clickable/Not Clickable |
|---|---|---|
| Active | User has successfully completed all sub-panes within the tab. | Clickable. User can click on tab and access sub-panes. |
| Active and Current | User is in the process of filling out sub-pane(s) within the tab. | Not Clickable. If user is filling out sub-panes within current tab, clicking on the tab should not re-post form data. |
| Inactive 1 | Not accessible to the con- | Not Clickable. |

US 7,707,505 B1

9

10

### TABLE 1-continued

| Tab State | Description | Clickable/Not Clickable |
| --- | --- | --- |
| | sumer. | |
| Inactive 2 | Not accessible to the consumer; however an adjacent tab to the left is in an Active, Active and Current, or Active and Error state | Not Clickable. |
| Active and Error | Consumer has an error on one or more sub-panes within a tab. | Not Clickable. If user is correcting a sub-pane within tab, clicking on the tab should not re-post form data. |

In one embodiment of the present invention, a consumer is not permitted to submit two Requests for Quotations (RFQs) in the same product during a shopping session, even if the consumer wants to submit a RFQ to a different carrier. Therefore, when displaying the Quote Thank You page at the end of the process, the process will not make it easy for the consumer go back and re-submit quotes. The consumer would only be frustrated with an "Our records show you have already submitted an RFQ" error message that prevents him or her from further shopping.

At this point, all tabs on the (online) RFQ Thank You page are disabled. The Quotes tab remains Active and Current. The only action the consumer can take from the Thank You page is to click on the "Shop for more Quotes" button (or use their browser's Back button).

For the Thank You pages that are displayed when a consumer only has offline quotes or no quotes (Offline Thank You, General Thank You, and Sorry Thank You), no tabs are disabled.

In an alternate embodiment of the present invention, multiple requests for quotes are allowed and prior tabs are therefore not disabled. In this embodiment, an additional data state is created based on the original state and including the revised data supplied by the user.

Subject to error processing described below, clicking on a completed tab (i.e., a tabbed pane for which all sub-panes representing the entire associated form set have been completely filled out) takes the consumer to the selected tab.

Clicking on the Continue button in a sub-pane (page) takes the user to the next logical page within the virtual application.

The most important aspect of the user interface of the present invention is not that it has tabs or that it enables a certain amount of non-sequential (non-linear) access to the various form sets within a virtual application, but that it maintains data state across all panes. As well known by those of ordinary skill, the Internet and web pages in particular are essentially stateless: no memory (or at most very little, such as the last page or pages visited) is preserved upon hyperlinking from one page to another. Prior art on-line forms have cached limited information either on the client or host server machines so that a form spanning several pages may be completed. Such caching has been limited to discrete, user-supplied information rather than including virtual application status and data dependencies as is provided by the present invention.

In contrast to the prior art, the present system, in all its embodiments, maintains virtual application information, relative dependencies, and information context obtained and/or derived from each pane accessed by the user/applicant. This state maintenance enables use of standard browser Back and Forward button functions without loss of data and without losing the user's "place" in the application process. A user can therefore "back up" one or more sub-panes or panes (i.e.,

switch to a logically "earlier" tab) and correct or change a data entry without having to re-enter any data from that earlier point forward to the point at which the user jumped back.

Consider the following example: a virtual application consists of five logical form sets presented in tabbed panes labeled (in logical order of completion) A, B, C, D, and E. Assume that the user has completed tabs A, B, C, and D and is viewing tab E. Assume further that the user now realizes a piece of information in tab B must be changed. According to one embodiment of the present invention, she can click on tab B, change the information, and use the conventional browser Back button to return to tab E. Alternatively, the user can simply select tab E directly while viewing tab B and return to where she left off in tab E without any loss of data or the need to re-enter information.

While this sound intuitive, it is in fact impossible under the prior art because the data entered in tabs C, D, and E (if any) will have been expired (i.e., erased and thus lost) by the act of switching to the tab B environment. Data may be lost due to insufficient page cache resources on the server or client computers or due to security restrictions set by either the user or a system administrator. As an example of the latter situation, the well-known Internet Explorer browser version 5.0 for the Macintosh automatically erases (i.e., deliberately does not cache) secure web pages so that the Back button always returns a blank (unfilled) form, rather than the previously filled-in one.

Dynamic Error Trapping and Handling

In general, the present invention approaches error correction by actively walking the user/applicant/consumer through the pages that need to be corrected rather than have the consumer walk themselves through the error correction process. FIG. 17 shows an example of a pane containing an error (an "errored pane"). Indicator 1710 shows, in a contrasting color in one embodiment, that an error is present. FIG. 18 shows an alternate method of altering an error by using error icon 1810.

In the current art, if a consumer makes an error on a page of a virtual application, they have to backtrack to the point of the error and then progress through the application again, linearly, from that point until the end, even through pages that do not have errors. Using the tabbed pane and intelligent user interface of the present invention, the user can be directed to only the pages that need to be corrected. The consumer can then choose where they want to go after error correction is complete.

How errors are processed depends on where the consumer is in the application and whether they want to progress forward from the tab they are on or backward after they make (and correct) an error. For error processing, five state definitions are required:

Previously Completed Backward Tab=Tab that user at one time completed successfully. In the tab order, this tab resides behind the tab the consumer is currently accessing.

Previously Completed Forward Tab=Tab that user at one time completed successfully. In the tab order, this tab resides in front of the tab the consumer is currently accessing.

Previously Completed Forward Page (or sub-pane)=Page (sub-pane in the current pane or tab) that user at one time completed successfully. In page order, this page resides in front of the page the consumer is currently accessing. This page can either be under the same tab that consumer is accessing or under a Previously Completed Forward Tab.

US 7,707,505 B1

**11**

Initiating Tab=The Active and Current Tab when user clicks on a Destination Tab.

Destination Tab=The previously completed forward tab that the user has clicked on.

If the consumer clicks on a previously completed forward page, the process will re-validate all pages between the page the consumer is on in the initiating tab and up to, but not including, the first page of the destination tab. It is understood that this will have a performance impact, but that is preferred to the impacts of not having a fully complete set of data at time of quote and/or lead submission at the end of the virtual application process.

Table 2 shows a chart of tab navigation states in the presence of errors.

TABLE 2

| Scenario | Consumer Clicks On | Error Trap Action |
|---|---|---|
| Consumer enters erroneous data on a page within a tab that has not been previously completed | Continue | Present errors to consumer on page they are accessing. |
| | Previously completed backward tab | Presents errors to consumer and display "Warning" message box. |
| | Previously completed forward tab | There are no forward tabs available in this scenario. (They are disabled.) |
| Consumer changes information within a previously completed tab, causing an error on that page | Continue | Present errors to consumer on page they are accessing. |
| | Previously completed backward tab | Present errors to consumer and display "Warning" message box. |
| | Previously completed forward tab | Presents errors to consumer on page they are accessing. |
| Consumer changes information within a previously completed tab, causing an error (or errors) on other previously completed forward pages | Continue | Take consumer to the next logical page in the application. |
| | Previously completed backward tab | Save consumer's changes and take consumer to the backward tab. |
| | Previously completed forward tab | Take consumer to the first previously completed forward page in the application with errors (potentially skipping pages without errors). This may or may not be within the tab clicked on. |
| Consumer enters erroneous data on a page within a tab that has not been previously completed. | Continue | Presents errors to consumer on current,active page. |
| | Previously completed backward tab | Presents errors to consumer and display "Warning" message box. |
| | Previously completed forward tab | There are no forward tabs available in this scenario. (They are disabled.) |
| Consumer changes information within a previously completed tab, causing no errors. | Continue | Take consumer to next logical pane or sub-pane (page) in the application. |
| | Previously completed backward tab | Take consumer to first page in the tab pane clicked on. |
| | Previously completed forward tab | Take consumer to first page in the tab pane clicked on. |

**12**

In some embodiments, if erroneous data is entered in a sub-pane or pane (page), or if newly entered data exposes previously entered data as erroneous, the tabs representing panes with errors are highlighted in a special color or otherwise distinguished from completed tabs as by animation of shading. If errors occur on multiple tabs, all errored tabs are not highlighted as Active and Error at the same time. Rather, the user is stepped through the errored tabs to correct the errors highlighted in each pane or sub-pane, one at a time. The tabs that are yet to be corrected will remain in the Error color until corrected.

All existing data dependencies will remain in place (with existing validation and error messaging unless otherwise specified), including, for example, but not limited to the following in the context of an on-line auto insurance application:

State Change->(determines) Vehicle Garage City/Zip/State, Coverages

Add Driver->Usage

Add Vehicle->Usage, Coverages

Current Date->Coverage Effective Date

Spouse Licensed->Spouse Included

The purpose of the "Warning" message box discussed in Table 2 is to let the user know that they are will lose data on the current, Active page if they go back to a previously completed tab and to give the user the chance to complete the current page and/or fix the errors. In an alternate embodiment, the current consumer data is temporarily saved (and not lost) before jumping to a previously completed backward tab, thus eliminating the need to display the Warning message entirely.

Warning message operation in the context of selecting a previously completed backward tab is summarized as follows:

The page the user created the error on is reloaded with conventional error messaging and flagging, such as by highlighting, animating, or coloring erroneous entries or inserting error messages. The erroneous data is re-displayed on this page.

After the page with error is rendered, the Warning message box appears.

If the user clicks on the "OK" button in the Warning message box, the user will lose the changes they made on the current page and be taken to the tab section they clicked on. The message box will disappear.

If the user clicks on the "Cancel" button in the Warning message box, the box will disappear and the user will be able to correct the information on the currently active page.

The process continues until the consumer corrects all information or clicks on the "OK" button in the Warning message box.

For users with browsers that cannot support conventional message box (pop-up) display technology (presumably a very small percentage of all browsers), the process automatically displays the active page with conventional error messages but without further explanation explanation.

Navigation Flowchart

The overall virtual application flowchart for an on-line automobile insurance quote is presented in FIG. **19**. Grey card icons **1910-1917** represent the eight panes discussed above. The white boxes, such as Driver **1930** and Driver, Continued **1933** represent the sub-panes (pages) displayed in sequence for each tab.

Virtual application processing flow may be better understood in light of the following terminology for users:

Tentative=Consumers who are within an InsWeb executable on-line application (including the application Start

US 7,707,505 B1

**13**

page) but have not logged in to an existing InsWeb account and have also not entered as a New User

Uncommitted=Consumers who are within an InsWeb executable on-line application (including the application Start page) and have entered an application as a New User.

Committed=Consumers who are within an InsWeb executable on-line application (including the application Start page) and have logged into an existing InsWeb account as a Returning User.

The tabbed intelligent user interface is intended to streamline the flow of the on-line application process in at least three ways:

by parameterizing the buttons on the application default (Start) page or pane based on determining if the user is "tentative", "committed" or "uncommitted" when they reach their page;

by showing all consumers the same default (Start) page regardless of what channel they have come from (i.e. Yahoo or a personal information manager [PIM] interface); and

by actively depositing returning users to the most relevant page of the application based on what that user did in the application during their last visit (or lack of a last visit). For a returning user, it is desirable to help get them to where they need to go without having to step through the application linearly.

To determine which buttons to show the consumer on the application Start page, one needs to determine if the user is "Tentative," "Uncommitted," or "Committed" at the time they reach the default page. The intelligent user interface for any on-line application operating according to an embodiment of the present invention must have to understand the consumer's status before it can display the Start page.

For a "Tentative" user, the interface displays two button options on the Start page: New and Returning. The user will have to figure out if they are New users of the service or Returning users. For example: a consumer browsing the web enters an Auto Coverage Analyzer tool from the InsWeb Internet home page and has not previously entered a product application or logged into the site during that session. The consumer's status is "Tentative" because the consumer has neither logged in to an on-line application as a Returning User nor entered an application as a New User. Therefore, when the

**14**

consumer clicks the "Get Auto Quotes Now" button from the tool, the Auto Insurance on-line application Start page will have both the New and Returning User buttons.

For the "Uncommitted" or "Committed" user, the interface displays only one button on the Start page, labeled "Continue." The Continue button contains, in some embodiments, animation to draw the user's attention. Once the Continue button is clicked, the word Continue changes to "Retrieving Info . . . " and the last completed page of that user's on-line application is displayed. In the case of an Uncommitted user, the Start page is displayed as that user will not have entered any application information for that particular type of service or product.

For example: a consumer has entered the Renter's Insurance on-line application as a New User. After completing the application, the user decides to shop for more quotes. She clicks a link to the Automobile Insurance on-line application. The Auto application Start page has only a "Continue" button on it because the consumer's status is "Uncommitted." If the consumer had logged in to the Renter's application as a Returning User and followed the procedure described above, the Auto default page would still only have had the "Continue" button because the consumer would have a "Committed" status.

Once it is determined that a user is Committed, Uncommitted, or Tentative, the interface process needs to determine what page of the application the user should be taken to. This will depend on which button the consumer chooses on the Start page, what the user did last in the application, if anything, and if they currently have errors they need to correct.

If the consumer chooses the New User option, the consumer will be presented with the first data entry page of the application. If the user chooses the Returning User option (or clicks on the Continue button), Table 3 describes the general rules that determine the first page at which the user will begin.

Note that input validation (error checking) needs to take place on all data to determine where to start the user in the application. If the user is going to be taken straight back to the quote tab (i.e., the Quote tab in the automobile insurance representative embodiment described above), application filtering and risk rating (as known in the insurance quotation art) would also have to occur prior to presentation of quotes.

TABLE 3

| Processing Determination | Result (User begins at . . . ) | Error Display |
|---|---|---|
| User has never entered data for the application | First application data entry page | N/A |
| User was in application Filled out partially Returns with no errors | Next logical page that requires data entry | Upon checking the database, if page has zero fields completed, then error messages will not be displayed. Upon checking the database, if page has one or more fields completed, then error messages will be displayed. Fields that we default for the user don't count as "being completed" unless they are not committed to the database |
| User was in application Filled out partially or went all | First error page. | Errors will be displayed. |

US 7,707,505 B1

15    16

TABLE 3-continued

| Processing Determination | Result (User begins at . . . ) | Error Display |
|---|---|---|
| the way to the Quotes tab User returns with errors User was in application Went all the way to the Quotes tab User returns with no errors | First page under Quotes tab. | N/A |

Alternate Embodiments

Although a set of single tabs each accessing a single pane or set of sub-panes is described, those skilled in the art will realize that there is no fundamental limit on the tab/pane hierarchy. In fact, each tab could access a pane itself containing tabs for accessing further panes or sets of sub-panes, ad infinitum. Accordingly, the invention is not limited to a single tab/pane hierarchy but instead contemplates any hierarchical, hyperlinked, and/or ordered structure of data and/or queries presented using a web browser or similar device.

The order in which the steps of the present method are performed is purely illustrative in nature. In fact, the steps can be performed in any order or in parallel, unless otherwise indicated by the present disclosure.

The method of the present invention may be performed in hardware, software, or any combination thereof, as those terms are currently known in the art. In particular, the present method may be carried out by software, firmware, or microcode operating on a computer or computers of any type. Additionally, software embodying the present invention may comprise computer instructions in any form (e.g., source code, object code, interpreted code, etc.) stored in any computer-readable medium (e.g., ROM, RAM, magnetic media, punched tape or card, compact disc (CD) in any form, DVD, etc.). Furthermore, such software may also be in the form of a computer data signal embodied in a carrier wave, such as that found within the well-known Web pages transferred among computers connected to the Internet. Accordingly, the present invention is not limited to any particular platform, unless specifically stated otherwise in the present disclosure.

While particular embodiments of the present invention have been shown and described, it will be apparent to those skilled in the art that changes and modifications may be made without departing from this invention in its broader aspect and, therefore, the appended claims are to encompass within their scope all such changes and modifications as fall within the true spirit of this invention.

We claim:

1. A method of providing an intelligent user interface to an on-line application comprising the steps of:
furnishing a plurality of icons on a web page displayed to a user of a web browser, wherein each of said icons is a hyperlink to a dynamically generated on-line application form set, and wherein said web browser comprises Back and Forward navigation functionalities;
displaying said dynamically generated on-line application form set in response to the activation of said hyperlink, wherein said dynamically generated on-line application form set comprises a state determined by at least one user input; and
maintaining said state upon the activation of another of said icons, wherein said maintaining allows use of said Back and Forward navigation functionalities without loss of said state.

2. The method of claim 1, wherein said displaying said dynamically generated on-line application form set comprises combining information from a template file and either a database or a conditional merge file or both to form said dynamically generated on-line application form set.

3. The method of claim 1, wherein said dynamically generated on-line application form set comprises data and queries presented as part of a process for applying for a service.

4. The method of claim 3, wherein said service comprises property or casualty insurance, life insurance, or health insurance.

5. The method of claim 1, wherein said icons are depicted as tabs along one or more inner edges of said web page.

6. The method of claim 1, wherein said icons are depicted as tabs along one or more inner or outer edges of a frame displayed within said web page.

7. The method of claim 1, wherein said web page comprises quasi-static elements distinct from said dynamically generated on-line application form set, wherein said displaying said dynamically generated on-line application form set in response to the activation of said hyperlink affects the display of said quasi-static elements.

8. The method of claim 1, wherein said plurality of icons displayed on said web page is determined in part by said user input.

9. A computer system for providing an intelligent user interface to an on-line application, comprising computer instructions for:
furnishing a plurality of icons on a web page displayed to a user of a web browser, wherein each of said icons is a hyperlink to a dynamically generated on-line application form set, and wherein said web browser comprises Back and Forward navigation functionalities;
displaying said dynamically generated on-line application form set in response to the activation of said hyperlink, wherein said dynamically generated on-line application form set comprises a state determined by at least one user input; and
maintaining said state upon the activation of another of said icons, wherein said maintaining allows use of said Back and Forward navigation functionalities without loss of said state.

10. The computer system of claim 9, wherein said displaying said dynamically generated on-line application form set comprises combining information from a template file and either a database or a conditional merge file or both to form said dynamically generated on-line application form set.

11. The computer system of claim 9, wherein said dynamically generated on-line application form set comprises data and queries presented as part of a process for applying for a service.

12. The computer system of claim 11, wherein said service comprises property or casualty insurance, life insurance, or health insurance.

US 7,707,505 B1

17

**13.** The computer system of claim **9**, wherein said icons are depicted as tabs along one or more inner edges of said web page.

**14.** The computer system of claim **9**, wherein said icons are depicted as tabs along one or more inner or outer edges of a frame displayed within said web page.

**15.** The computer system of claim **9**, wherein said web page comprises quasi-static elements distinct from said dynamically generated on-line application form set, wherein said displaying said dynamically generated on-line application form set in response to the activation of said hyperlink affects the display of said quasi-static elements.

**16.** The computer system of claim **9**, wherein said plurality of icons displayed on said web page is determined in part by said user input.

**17.** A computer-readable storage medium, comprising computer instructions for:

furnishing a plurality of icons on a web page displayed to a user of a web browser, wherein each of said icons is a hyperlink to a dynamically generated on-line application form set, and wherein said web browser comprises Back and Forward navigation functionalities;

displaying said dynamically generated on-line application form set in response to the activation of said hyperlink, wherein said dynamically generated on-line application form set comprises a state determined by at least one user input; and

maintaining said state upon the activation of another said icons, wherein said maintaining allows use of said Back and Forward navigation functionalities without loss of said state.

18

**18.** The computer-readable storage medium of claim **17**, wherein said displaying said dynamically generated on-line application form set comprises combining information from a template file and either a database or a conditional merge file or both to form said dynamically generated on-line application form set.

**19.** The computer-readable storage medium of claim **17**, wherein said dynamically generated on-line application form set comprises data and queries presented as part of a process for applying for a service.

**20.** The computer-readable storage medium of claim **17**, wherein said service comprises property or casualty insurance, life insurance, or health insurance.

**21.** The computer-readable storage medium of claim **17**, wherein said icons are depicted as tabs along one or more inner edges of said web page.

**22.** The computer-readable storage medium of claim **17**, wherein said icons are depicted as tabs along one or more inner or outer edges of a frame displayed within said web page.

**23.** The computer-readable storage medium of claim **17**, wherein said web page comprises quasi-static elements distinct from said dynamically generated on-line application form set, wherein said displaying said dynamically generated on-line application form set in response to the activation of said hyperlink affects the display of said quasi-static elements.

**24.** The computer-readable storage medium of claim **17**, wherein said plurality of icons displayed on said web page is determined in part by said user input.

\* \* \* \* \*

# United States Court of Appeals
## for the Federal Circuit

*Internet Patents Corporation v Active Network, Inc.,*
2014-1048, -1061, -1062, -1063

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by BECK, BISMONTE & FINLEY, LLP, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **January 27, 2014** counsel for Appellant has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

| | |
|---|---|
| JOHN FRANCIS TRIGGS | MATTHEW D. MURPHEY |
| WADDEY & PATTERSON, P.C. | MEGHAN CANTY SHERRILL |
| 1600 Division Street, Suite 500 | TROUTMAN SANDERS LLP |
| Roundabout Plaza | 5 Park Plaza, Suite 1400 |
| Nashville, TN 37203 | Irvine, CA 92614 |
| 615-242-2400 | Direct: (949) 622-2700 |
| jft@iplawgroup.com | Fax: (949) 622-2739 |
| *Counsel for Appellees Permanent* | matt.murphy@troutmansanders.com |
| *General Assurance Corporation of* | meghan.sherrill@troutmansanders.com |
| *Ohio and The General Automobile* | *Counsel for Appellee* |
| *Insurance Services, Inc., dba The* | *Active Network, Inc.* |
| *General, Permanent General* | |
| *Assurance Corporation* | |

THOMAS F. FITZPATRICK
ANDY H. CHAN
PEPPER HAMILTON LLP
555 Twin Dolphin Drive, Suite 310
Redwood City, CA 94065
Direct: (650) 620-9516
Fax: (650) 620-9594
chana@pepperlaw.com
fitzpatt@pepperlaw.com
*Counsel for Appellee*
*Quinstreet, Inc.*

STEPHEN S. KORNICZKY
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, CA 92130
Direct: (858) 720-8900
Fax: (858) 509-3961
skorniczky@sheppardmullin.com

EDWARD V. ANDERSON
DEEPALI BRAHMBHATT
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
379 Lytton Avenue
Palo Alto, CA 94301
Direct: (650) 815-2600
Fax: (650) 815-2601
evanderson@sheppardmullin.com
dbrahmbhatt@sheppardmullin.com
*Counsel for Appellee Tree.com, Inc.*

Paper copies will also be mailed to the above counsel at the time paper copies are

sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court, via Federal Express, within the time provided in the

Court's rules.

January 27, 2014        /s/ Robyn Cocho
                                      Robyn Cocho
                                      Counsel Press

# CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Appellant Internet Patents Corporation, f/k/a Insweb Corporation, hereby certifies that the foregoing brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Based on the word count tool for the software used to prepare the foregoing brief, the number of words in the brief, excluding the sections excludable under Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Federal Circuit Rule 32(b), is 12,299.

This brief was printed using a 14 point proportional Times New Roman font.

Dated: January 27, 2014                    Respectfully submitted,

                                           By: /s/ Joseph A. Greco
                                               Joseph A. Greco
                                               jgreco@beckllp.com
                                               Justin Beck
                                               jbeck@beckllp.com
                                               Kimberly P. Zapata
                                               kzapata@beckllp.com
                                               BECK, BISMONTE & FINLEY
                                               150 Almaden Blvd, 10th Floor
                                               San Jose, CA 95113
                                               (408) 938-7900

                                           *Attorneys for Internet Patents Corporation,
                                           f/k/a Insweb Corporation*